Sanya **COULTER**, Appellant,

v.

**GERALD FAMILY CARE,**
**P.C., et al., Appellees.**

Nos. 06–CV–480, 06–CV–751.

District of Columbia Court of Appeals.

Argued Feb. 12, 2008.
Decided Jan. 29, 2009.

Kenneth Shepherd for appellant.

Brian J. Nash, with whom Michael L. Sanders was on the brief, for appellees Gerald Family Care, P.C., and Eugene Taylor.

Andrew J. Spence, with whom Stephen L. Altman was on the brief, for appellee Terrence M. Fullum.

Curtis A. Boykin, with whom Frederick A. Douglas was on the brief, Washington, for appellee Nixon Asomani.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and FERREN, Senior Judge.

THOMPSON, Associate Judge:

Through an amended complaint filed on February 5, 2004, plaintiff/appellant Sanya Coulter brought suit in the Superior Court against defendants/appellees—three physicians and a physician's group—alleging that they were negligent in diagnosing and treating her breast cancer. The matter progressed to trial, and after Coulter had put on four of her witnesses but before she had concluded the presentation of her case, the trial judge, the Honorable Natalia Combs Greene, directed verdicts in favor of each of the defendants/appellees, reasoning that Coulter could not, even with the additional witnesses that she planned to call, establish that (any of the) defendants were liable for medical malpractice. Coulter appeals from that final judgment and from the court's order awarding costs and attorneys' fees. She also challenges several of the court's pre-trial rulings, including the court's denial of her motion to amend her complaint to add allegations of intentional misconduct by defendant/appellee Terrence Fullum, the court's orders granting defendants' motions in limine to exclude certain evidence, and the court's order requiring the parties not to disclose information contained in the record. In addition, Coulter contends that

Judge Combs Greene was biased in favor of defendants/appellees, erred in denying Coulter's pre-trial Motion for Judicial Disqualification, and abused her discretion by declining to recuse herself and to disclose any relationships she might have with the defendants/appellees or their malpractice insurer.

We share appellees' perception that Coulter purports to "find[ ] error in nearly every ruling made by the Trial Judge since the inception" of this litigation. We admonish her counsel that such a scattershot approach to briefing casts doubt on every claim and creates a substantial risk that truly meritorious claims inadvertently will be overlooked.

Notwithstanding, we discern merit in a few of the points that Coulter raises. We are persuaded by her argument that the trial court's dismissal of her claim against appellee Fullum was premature and that Coulter and breast surgeon Marie Pennanen, one of Coulter's designated experts, should have been permitted to testify. In addition, we agree with Coulter that the court entered an overbroad confidentiality order and erred in granting the request by appellees Eugene Taylor and Gerald Family Care, P.C., for attorneys' fees. In all other respects, we affirm the trial court's rulings. We also reject Coulter's claims of "partisan misconduct" by the trial judge.

## I. Factual Background and Coulter's Theories of Liability

We begin with a brief overview of the factual background as alleged by Coulter, supplying additional detail *infra*, as we analyze Coulter's claims. On August 28, 2001, Coulter was seen by Dr. Eugene Taylor, a family practitioner associated with Gerald Family Care, P.C., and reported to him her concern about a "lump" she had noticed in her left breast. Dr. Taylor—who, Coulter alleges, performed an

inadequate one-finger examination of her breast—told her that the lump was a harmless cyst. On November 13, 2002, Coulter reported the lump to Dr. Nixon Asomani, a gynecologist. Dr. Asomani, who identified a cyst or mass in Coulter's left breast, ordered a sonogram, which was performed on December 7, 2002. Seeing the result of the sonogram, Dr. Asomani referred Coulter on December 26, 2002 to Dr. Terrence Fullum, a surgeon, for follow-up. Coulter contends that Dr. Asomani "failed to properly advise [her] concerning the urgency for identification of the lump and the available options." She also alleges that Dr. Fullum "negligently delayed" Coulter's initial consultation until January 30, 2003, and that, even though he saw her sonogram that showed an irregular breast mass, he scheduled her for a non-urgent "general screening mammogram."

The mammogram was performed on March 21, 2003. After Dr. Fullum received the mammogram results, he met with Coulter on March 25, 2003 and told her that she would need a biopsy. Dr. Fullum performed the biopsy on April 1, 2003. On April 17, 2003, Dr. Fullum informed Coulter that she had cancer and recommended a mastectomy. He performed the mastectomy on June 11, 2003. Coulter alleges that Dr. Fullum negligently delayed scheduling the diagnostic procedures that would have detected her cancer, and negligently delayed performance of the mastectomy.

Overall, Coulter asserts that because of appellees' negligence, her breast cancer "grew from a small cancer with a favorable prognosis in August 2001 to a massive cancer with lymph node involvement and a very unfavorable prognosis in June 2003."

At trial, Coulter called defendants Taylor and Fullum and also called two of her designated experts, Dr. John Woodyear and Dr. Howard Abel. Dr. Fullum called one witness, Dr. Rebecca Zuurbier, out of turn. Coulter then sought to read into the record the deposition testimony of her expert Dr. Joe Haines, and to call her expert Dr. Marie Pennanen. The court would not allow the testimony of either witness, concluding, on the basis of excerpts from their deposition testimony, that neither would testify that any defendant breached the standard of care. Since no expert had testified that any of the defendants breached the standard of care, and since the only remaining witnesses that Coulter planned to call (Coulter herself and possibly another lay witness, Quawanna Thomas) were not qualified to testify that any of the defendants breached the standard of care, the court entered directed verdicts in favor of each defendant. Thereafter, the court granted the motions by defendants Fullum, Taylor and Gerald Family Care for costs and also granted the motion by defendants Taylor and Gerald Family Care for attorneys' fees. This appeal followed.

## II. The Appearance of Bias and Alleged "Partisan Misconduct"

We begin by considering Coulter's claim that Judge Combs Greene had an appearance of partiality or an actual bias in favor of defendants/appellees that tainted both the pre-trial and trial proceedings and "deprived [Coulter] of her right to an impartial adjudicator."

█ As the basis for her claim about the appearance of partiality, Coulter asserts that Judge Combs Greene is the spouse of a physician who is "of the same ilk as the appellee physicians" and who "was insured under the same Malpractice pool as the appellees." She argues that this (purported) circumstance was sufficient to "lead an objective observer ... reasonably to question the judge's impartiality," *Mejia v.*

*United States,* 916 A.2d 900, 903 (D.C. 2007), and that this purported appearance of bias made it inappropriate for Judge Combs Greene to dispose of Coulter's pre-trial Motion for Disqualification simply by describing a reasonable basis for each of the pre-trial rulings in appellees' favor. Coulter further contends that Judge Combs Greene was required to articulate her reasons for denying Coulter's motion requesting that the judge "disclose information relative to her status as a medical spouse and medical liability coverage."[1]

■ We see no need to discuss in detail the examples of purported bias that Coulter raised in her pre-trial Motion for Disqualification, which focused primarily on Judge Combs Greene's decisions to re-set deadlines for discovery and dispositive motions. We are satisfied from our review of the record that, substantially for the reasons Judge Combs Greene described in her order denying the motion, Coulter's claims of demonstrated bias do not withstand scrutiny. We do agree with Coulter that in her order, Judge Combs Greene should have responded not only to Coulter's claims of demonstrated bias, but also to Coulter's claim alleging an appearance of partiality. That is because "a judge must recuse from any case in which there is an appearance of bias or prejudice sufficient to permit the average citizen reasonably to question the judge's impartiality." *Garrett v. United States,* 642 A.2d 1312, 1315 (D.C.1994) (internal punctuation omitted).[2] But we also conclude that the omission was harmless, because the putative circumstances that Coulter describes are not ones as to which "an objective person, informed of the trial proceedings, could reasonably conclude an appearance of bias existed." *Mejia, supra,* 916 A.2d at 903.

Canon 3(E)(c) of the District of Columbia Courts Code of Judicial Conduct states that:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including ... where ... the judge's spouse ... has an economic interest in the subject matter in controversy ... or has any more than *de minimis* interest that could be substantially affected by the proceeding.

CODE OF JUDICIAL CONDUCT OF THE DISTRICT OF COLUMBIA COURTS, Canon 3(E)(c) (1995).[3] The Code nowhere suggests that the mere fact that a judge's spouse belongs to the same profession as a party is enough to create an appearance of partiality. *Cf. Klein v. Dietz,* No. 95–CA–47, 1998 WL 896345, at*12, 1998 Ohio App. LEXIS 6196, at *35 (Ohio Ct.App., Dec. 16, 1998) ("To disqualify every judge from a medical malpractice suit merely because they are a member of some hospital board or have a family member in the practice of medicine would be extremely impractical").

Moreover, the Code states that an "economic interest" denotes "ownership of a more than *de minimis* legal or equitable interest, or a relationship as officer, director, advisor or other active participant, in the affairs *of a party.*" CODE OF JUDI-

---

1. Judge Combs Greene denied the Motion for Disclosure in a one-sentence order.

2. As one of our former colleagues noted, this court "has been one of the most vigilant in holding trial judges to a rigid standard of impartial appearance" and has "gone to further lengths ... in stressing the concept of 'appearance' in contradistinction to actual unfairness." (Paul) *Foster v. United States,* 618 A.2d 191, 195 (D.C.1992) (per curiam) (Reilly, J., dissenting).

3. Effective June 1, 1995, the CODE OF JUDICIAL CONDUCT FOR THE DISTRICT OF COLUMBIA COURTS governs the conduct of judges of the District of Columbia Courts. *See In re W.T.L.,* 656 A.2d 1123, 1127 n. 6 (D.C.1995).

CIAL CONDUCT, *supra,* Terminology (emphasis added). Nothing in the Code suggests that the mere (purported) fact that a judge's spouse belongs to the same malpractice insurance pool as a defendant physician is enough to raise an appearance of bias.[4]

To discern the appearance of partiality that Coulter posits, we would have to make a number of assumptions for which there is no support in the record: that Judge Combs Greene's spouse was insured by the same malpractice insurance company and in the same malpractice pool as one or more of the defendants, and that a judgment against one or more of those defendants in this case would have a significant adverse impact on the malpractice insurance premiums paid by the judge's spouse. In other words, we would have to "layer[ ] several speculative premises on top of one another to reach [the] speculative conclusion" that Coulter would have us reach. *Scott v. Metropolitan Health Corp.,* 234 Fed.Appx. 341, 356 (6th Cir.2007) (quoting *Sensley v. Albritton,* 385 F.3d 591, 600 (5th Cir.2004)). Such an "edifice of conjecture will not support an objective conclusion that [the trial judge] has a financial interest in the outcome of this case." *Scott,* 234 Fed.Appx. at 357 (quoting *Sensley,* 385 F.3d at 600); *see also York v. United States,* 785 A.2d 651, 656 (D.C.2001) (citing authority that "speculation will not satisfy the requirements for disqualification of a judge") (citations omitted); *Hoatson v. New York Archdiocese,* 280 Fed.Appx. 88, 90 (2d Cir.2008) ("Any pecuniary interest that Judge Crotty's brother may have in the instant litigation by virtue of his status as a partner in a law firm that represents the [defendant] Archdiocese in other litigation is too 'remote, contingent, indirect or speculative' to lead a reasonable person to question Judge Crotty's impartiality"). We agree with an observation by the Supreme Court of Alabama in a case in which that court considered whether an appearance of bias arose from the fact that defense expert witnesses were members of the same mutual liability insurance company as the defendant: the "potential for bias ... due to ... coverage under a professional liability policy is so remote as to be virtually non-existent." *Otwell v. Bryant,* 497 So.2d 111, 115 (Ala.1986).

In light of the remoteness of any potential for bias, we also cannot agree that Judge Combs Greene abused her discretion in denying Coulter's request for disclosure. Coulter is correct that under the Code—specifically, the Commentary to Canon 3(E)—a judge should disclose on the record of her own accord "information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." CODE OF JUDICIAL CONDUCT, *supra,* Canon 3(E) cmt. However, "the law affirmatively shields judges from ... questioning" such as Coulter tendered to Judge Combs Greene. *Porter v. Singletary,* 49 F.3d 1483, 1489 n. 10 (11th Cir. 1995) (citing *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)).

Once trial commenced, Coulter did not renew her request that the trial judge recuse herself for bias, and appellees argue that we may review only for plain error Coulter's claims about the trial judge's "partisan misconduct" during voir

---

4. In elaborating on the meaning of "Economic interest," the Code explains that a "proprietary interest of a policy holder in a mutual insurance company" or "a similar proprietary interest" is not an economic interest in an organization "unless a proceeding pending or impending before the judge could substantially affect the value of the interest." CODE OF JUDICIAL CONDUCT, *supra.*

dire and trial. Assuming, however, that the recusal motion remained alive, and with due regard for any "risk of undermining the public's confidence in the judicial process," (*Thaddeus*) *Foster v. United States*, 615 A.2d 213, 222 (D.C.1992), we have painstakingly reviewed each of Coulter's many examples of claimed "partisan misconduct" by the trial judge. We see no evidence of partisan misconduct that could warrant relief under any standard of review.

■ This already-quite-lengthy opinion would require many more pages were we to address here each of Coulter's allegations of partisan misconduct. We discuss only a sampling (which, we think, will suffice to convey the tenor of the remaining examples).[5]

■ Several of Coulter's allegations of "partisan misconduct" focus on jury selection. One is that Judge Combs Greene refused to strike for cause a prospective juror, the daughter of a cardiologist, who said that she "maybe [had] a little bit of question about the validity of some" large medical malpractice settlements, and who expressed some concern about "whether there should be any cap on medical malpractice things" and about "high [malpractice] insurance premiums charged to OB-GYNs." But the juror also had a history of thyroid cancer, a breast biopsy and a lung mass—a history that one might expect would make her sympathetic to Coulter, counterbalancing her concern about large malpractice awards. Moreover, the juror said repeatedly that she thought she could be fair, saying at one point that she "could be fair unless I felt that the amount being requested was in my mind totally out of line with what the situation was but that would depend on what I heard." The juror made these statements in response to the court's extensive inquiries about whether she could be "fair in this case to everyone" and "fair in terms of the evidence." We see no basis for concluding that the court's action with respect to this juror evidenced bias in favor of appellees.[6]

■ Several of Coulter's claims of partisan misconduct reflect an erroneous un-

5. Coulter makes a number of allegations of "partisan misconduct" for which she provides no citation to the record or that she purports to substantiate by citing to a large span of transcript pages (*e.g.*, her argument that the court "misapplied the rules of evidence, applied the rules inconsistently, sustained frivolous objections, harassed Coulter's witnesses and counsel and obstructed the presentation of Ms. Coulter's case" and her claim that the court "refused to allow Coulter to ask relevant questions of Dr[s]. Fullum and Taylor"). In addition, as appellees aptly describe, "[o]ftentimes, [Coulter's] brief consists of little more than a stream of conclusory statements, leaving the Court to decipher the argument and find support in the record and the case law." In other words, in much of her brief, Coulter fails to meet her burden as appellant to present argument in support of her claims of error. *See Glenn v. Mindell*, 74 A.2d 835, 838 (D.C.1950). As we have previously admonished, "[w]hen an appellant disregards that rule we will not undertake to comb the record for an understanding of the claimed errors or for a determination of their merits. We consider only those errors assigned and argued." *Id.* (quoting *Eide v. Traten*, 73 A.2d 522, 523 (D.C.1950) (quotation marks omitted)).

6. Coulter also complains of Judge Combs Greene's court having "initiated efforts to disqualify several jurors who were single mothers with children." But Judge Combs Greene acceded to Coulter's objection to excusing Juror 625, one such juror. The court did put Juror 095 "at the end" of the line (to be considered only if an insufficient number of other jurors were qualified before the venire was exhausted). But the judge explained that this juror, who had just started a new position the previous Monday and who stated that she would likely be distracted by thoughts about work, "seem[ed] to be a little anxious" about her job situation.

derstanding of the law. For example, Coulter complains of Judge Combs Greene's having threatened to hold Coulter's counsel in contempt for having directly contacted defendants' experts to arrange deposition dates. Coulter's argument as to why this was improper is a citation to our case law recognizing that an adverse party may call another party's experts as witnesses. *See Abbey v. Jackson,* 483 A.2d 330, 333 (D.C.1984). However, nothing in *Abbey* required the trial judge to condone the contact by Coulter's counsel with defendants' experts. And, contrary to Coulter's argument, this court's opinion in *Nelson v. McCreary,* 694 A.2d 897, 903–04 (D.C.1997), in no way suggests that counsel's contact with the adverse party's testifying experts is permissible so long as no confidential or privileged information is disclosed. Judge Combs Greene's reaction was consistent with case law recognizing "the ethical issues raised by direct *ex parte* contact with an expert witness who will testify ... for the opposing party on the central issue in the case." *Chemical Bank v. Executive Mgmt. Co.,* 1995 WL 774526, 1995 Conn.Super. LEXIS 3429 (Conn.Super.Ct. Oct. 23, 1995); *see also Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir.1980) (holding that district court did not abuse its discretion in imposing sanctions following one party's contact with the other party's designated expert).[7]

 In another example of purported "partisan misconduct," Coulter asserts that Judge Combs Greene untruthfully told the jury that Coulter "consented to the presentation of Dr. Zuurbier's testimony out of turn." In fact, the judge told the jury that Coulter had "graciously allowed the Defendant to call this witness out of order" which was true in that—although he initially objected—Coulter's counsel made no further protest or response once the court described this accommodation as a matter of civility and asked counsel to explain why an accommodation was not appropriate. As to Coulter's suggestion that the judge's statement should be regarded as a partisan attempt "to avoid a ruling that Dr. Taylor waived the right to move for a directed verdict" by putting on a witness during plaintiff's case, the short answer is that a defendant does *not* "waive[ ] the right to move for a directed verdict at the close of the plaintiff's case merely by putting on evidence out of turn." *O'Neil v. Bergan,* 452 A.2d 337, 343 n. 7 (D.C.1982).[8]

An error of law also underlies Coulter's assertion that Judge Combs Greene "erroneously ruled that Dr. Fullum was Ms. Coulter's witness and could, therefore, be

7. Several of Coulter's other claims also focus on the discovery period. For example, she complains of Judge Combs Greene having "condoned serious misconduct by [Dr. Fullum's counsel] during the taking of Dr. Fullum's deposition." But, as far as we can discern from the record, Coulter never sought the court's intervention with respect to defense counsel's conduct during the deposition. During a hearing on another matter, Coulter's counsel told the court that Dr. Fullum's counsel "obstructed the deposition," but he never provided the court any details to substantiate the claim. Thus, we have no basis for concluding that Judge Combs Greene "condoned" misconduct by defense counsel.

8. With respect to Dr. Zuurbier, Coulter also complains that the trial court reprimanded her counsel for "alleged aggressive cross-examination of Dr. Zuurbier" and for attempting to humiliate Dr. Zuurbier. We have no basis for questioning the trial court's observation that counsel raised his voice and used "confrontational body language" with the witness. And, counsel certainly created at least the potential for embarrassment by asking the radiologist to demonstrate on her own body how a target area in the breast is marked for x-ray purposes.

lead [sic] by Fullum's own counsel." The court's ruling was correct. Under Super. Ct. Civ. R. 43(b), when a party (here, Coulter) calls an adverse party as a witness, that witness (here, Dr. Fullum) "may be cross-examined by the adverse party"; and, as our case law recognizes, leading questions are "the principal tool and hallmark of cross-examination." *United States v. Hsu,* 439 A.2d 469, 472 (D.C.1981) (citation and internal quotation marks omitted).

In summary, we reject Coulter's claims of "partisan misconduct," because we can say with assurance that, on the record before us, an objective observer would have no "difficulty understanding" that Judge Combs Greene's conduct of the trial "was not influenced" by bias. *Gibson v. United States,* 792 A.2d 1059, 1069 (D.C. 2002).

### III. Pre–Trial Rulings

We turn next to a consideration of Coulter's challenges to a number of the court's pre-trial rulings.

#### A. Rulings Relating to Coulter's Allegations of Sexual Misconduct

 After the filing of her initial complaint on January 23, 2004, Coulter filed her first amended complaint on February 5, 2004. The first amended complaint contains no allegations of sexual misconduct. During June 2004, defendants took Coulter's deposition, in which she testified that, during the course of her visits to Dr. Fullum, Dr. Fullum committed various acts of sexual misconduct against her. A flurry of motions followed. Dr. Fullum moved for a protective order that would preclude Coulter from publicizing her allegations of sexual misconduct. In October 2004, Coulter moved to amend her complaint to add allegations of sexual misconduct as a form of medical malpractice. Defendants filed motions in limine to preclude Coulter from

presenting evidence of sexual misconduct during the trial. The trial court denied Coulter's motion to amend but granted defendants' motions. Coulter challenges these rulings.

 This court reviews a trial court's decision to permit or deny an amendment of pleadings for abuse of discretion. *Taylor v. District of Columbia Water & Sewer Auth.,* 957 A.2d 45, 51 n. 15 (D.C.2008). We will uphold a refusal to allow an amendment if predicated on "valid grounds." *Id.* at 53 n. 20 (citation and internal quotation marks omitted). Stated differently, absent an abuse of discretion, we will not disturb a trial court's grant or denial of leave to amend a complaint. *See Eagle Wine & Liquor Co. v. Silverberg Elec. Co.,* 402 A.2d 31, 34 (D.C.1979).

Judge Combs Greene denied Coulter's motion to amend in an order dated December 7, 2004, explaining that she was "persuaded by defendants' arguments" that to allow the "eleventh hour filing would result in great prejudice to [the] defendants." Coulter argues that this ruling amounted to an abuse of discretion since the court thereafter extended the discovery deadline (to afford the parties time to complete depositions of experts) and since, as events unfolded, trial did not begin until more than sixteen months later.

We have recognized that "[t]he lateness of a motion for leave to amend ... may justify its denial if the moving party fails to state satisfactory reasons for the tardy filing and if the granting of the motion would require new or additional discovery." *Pannell v. District of Columbia,* 829 A.2d 474, 477 (D.C.2003) (citation omitted); *see also Eagle Wine, supra,* 402 A.2d at 35 (noting that the "determination may rest on findings that the moving party has not put forth any satisfactory reason for the delay (e.g., new information which could not have been uncovered earlier) and that

an 'unduly delayed' amendment would mean a large additional expenditure of effort and money by the opposing party in discovery on a new aspect of the case after substantial discovery already has taken place"). Here, the record shows that Coulter could have set forth her claim of sexual misconduct—which allegedly occurred during the January to June 2003 period—in either her initial or first amended complaint. Moreover, by the time Coulter sought to amend her complaint in October 2004, defendants had already deposed all but one of Coulter's witnesses. Although defendants learned of Coulter's sexual misconduct allegations during her June 2004 deposition, they argued that they would have prepared for and conducted her deposition and the expert depositions differently had they been apprised that Coulter intended to pursue these claims as a basis for a medical malpractice recovery.[9] As defendants explained to the trial court, to establish that Dr. Fullum committed medical malpractice by the alleged sexual misconduct, Coulter would have had to prove "that in the course of Dr. [Fullum's] ... treatment of [her], a relationship similar to a psychologist-patient relationship developed between the two; that it was a breach of the applicable standard of care for Dr. [Fullum] to engage in sexual acts with [her] during the course of or attendant to that relationship; and that the breach of the standard of care by Dr. [Fullum] proximately caused [her] claimed injuries." *McCracken v. Walls–Kaufman,* 717 A.2d 346, 353 (D.C.1998). These are matters that must be estab-

lished through expert testimony, *id.,* and that therefore, presumably, would have necessitated additional questioning of Coulter, the designation of additional defense experts (or an expansion of the scope of testimony by the experts that defendants had already designated), and a new round of depositions of those experts.[10] In addition, as Dr. Fullum argued to the trial court, trying Coulter's claims of sexual misconduct along with her claims of negligent diagnosis and treatment of her breast cancer may have impeded Dr. Fullum's ability to receive a fair trial on the latter claims. Taken together, these factors provided an ample reasonable basis for the court's denial of the motion to amend. While Judge Combs Greene did not explicitly refer to each of these factors, she stated, in denying the motion "[a]fter a review of the record and on consideration of the pleadings," that she had "considered the relevant factors," including the absence of any "reason why [Coulter] could not have included the amendment ... in the original Complaint or in the First Amended Complaint" and the "element of prejudice."

 Similar considerations of prejudice justify the court's granting of defendants' motion in limine to preclude evidence and argument regarding Coulter's allegations of sexual misconduct [11]—evidence that was rendered irrelevant in light of the order denying the motion to amend. Coulter is correct that the court's ruling on the motion in limine did not "articulate the grounds and rationale upon which the ruling was based." But that was not re-

9. During her deposition, Coulter answered that she did not know whether she "intend[ed] to pursue any claims against Dr. Fullum pertaining to" the alleged incidents of sexual misconduct.

10. Moreover, Judge Combs Greene found "a close question as to whether the [proffered] Second Amended Complaint truly set[ ] out a

sufficient basis to bring the matter within the holding of *McCracken v. Walls–Kaufman."*

11. We review a trial court's rulings on motions in limine for abuse of discretion. *See Ivey v. District of Columbia,* 949 A.2d 607, 611 (D.C.2008).

quired. *See Ibn–Tamas v. United States*, 407 A.2d 626, 636 n. 17 (D.C.1979) ("This is not to suggest that a trial court must articulate reasons, let alone correct reasons, for every evidentiary ruling. In most instances, the appellate court will be able to infer the reasoning upon which the trial court made its determination") (internal quotation marks and citation omitted).

■■■ During the discovery period, Coulter's counsel, in a letter to Dr. Fullum's counsel, said that Coulter was "considering a website to determine what is under the tip of [the] iceberg" concerning Coulter's allegations of sexual misconduct by Dr. Fullum. This led Dr. Fullum's counsel to move for a protective order pursuant to Super Ct. Civ. R. 26(c). On September 22, 2004, Judge Combs Greene issued an order—which Coulter refers to as a "gag order"—stating that "all parties to this matter, including their counsel, agents, and expert witnesses retained on their behalf, are strictly prohibited from disseminating, disclosing, publicizing, distributing, or otherwise making available any information appearing in the court record, witness statements and deposition transcripts in this matter to persons or entities not parties to this case [during] its pendency." [12] The order also requires the

parties to "take all necessary precautions to prevent the disclosure of the allegations being made in this litigation" (without limiting its scope to the allegations of sexual misconduct). Coulter contends that this protective order was excessively broad and infringed upon her First Amendment rights.[13]

■■■ There can be no doubt that the trial judge had discretion, pursuant to Super. Ct. Civ. R. 26(c), to issue a protective order that would prevent abuse of the discovery process.[14] To prevent such abuse, the court was authorized to "impose specific terms and conditions for discovery and ... require that confidential information [obtained through discovery] ... not be disclosed at all," *Mampe v. Ayerst Lab.*, 548 A.2d 798, 803 (D.C.1988), upon the moving party's showing "with some specificity how it may be harmed by the disclosure of a particular document or piece of information." *Id.* at 804.[15] However, the protective order that the court entered went far beyond what could be justified under the discovery rules because it precludes the dissemination of *any* information contained in the case record, without regard to whether the information is confidential, and without regard to whether the information was obtained through discovery.[16]

**12.** The protective order also states that "[n]othing in this order shall be read to prevent the parties, including defendant Terrence Fullum, from applying to the Court to maintain the confidentiality of the subject materials after the disposition of this case."

**13.** She also asserts that the protective order "placed a chill upon her case preparation," but does not describe any way in which the order impeded her preparation with respect to the allegations in her First Amended Complaint.

**14.** Super. Ct. Civ. R. 26(c) authorizes the trial court to grant, "for good cause shown, ... any order which justice requires to protect a party or person from annoyance, embarrass-

ment, oppression, or undue burden or expense." *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir.1999) (recognizing that inquiry into sexual relationships may cause undue embarrassment for the purposes of Fed. R.Civ.P. 26(c)).

**15.** In such circumstances, "[a] court has substantial discretion in deciding to grant a protective order, and its decision to do so will not ordinarily be disturbed on appeal unless that discretion has been abused." *Mampe, supra*, 548 A.2d at 803–04.

**16.** In urging the court to enter the order, defendants cited case law that recognizes that the court has discretion to seal the record.

For similar reasons, we also agree with Coulter that the scope of the protective order exceeds what the First Amendment permits. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) ("where . . . a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment"). In seeking the order, Dr. Fullum cited, *inter alia,* the potential impact of unrestrained speech by Coulter about her allegations of sexual misconduct on Dr. Fullum's professional career. But a prior restraint on speech that is premised merely on protecting business interests "fails first amendment scrutiny." *Bailey v. Systems Innovation, Inc.,* 852 F.2d 93, 99 (3d Cir.1988). Even if the court had fashioned the broad protective order to protect the impartiality of potential jurors—a rationale the court did not suggest—at a minimum some narrowing of the order would have been required to avoid violating the parties' First Amendment rights. *Wood v. Georgia,* 370 U.S. 375, 396, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) ("when the right to speak conflicts with the right to an impartial judicial proceeding, an accommodation must be made to preserve the essence of both"); *see also Bailey, supra,* 852 F.2d at 100 (vacating order that prohibited extrajudicial statements by attorneys in a civil case because the court did not consider other methods to ensure a fair trial, such as "careful voir dire of prospective jurors, or emphatic jury instructions"); *Pfahler v. Swimm,* 2008 WL 323244, 2008 U.S. Dist. LEXIS 12064 (D.Colo. Feb. 4, 2008) (vacating restraining order where court failed to consider whether other measures would be likely to mitigate the effects of unrestrained pre-trial publicity) (citing *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 550, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)).

Accordingly, on remand, the trial court should consider whether a protective order is necessary to "ensure a fair trial," *Bailey, supra,* 852 F.2d at 99, or to prevent "abuse of the discovery process." *Mampe, supra,* 548 A.2d at 805. If the court determines that a prior-restraint order is warranted, any order it issues must be "carefully drawn order [so as to] limit[ ] speech as little as possible." *In re Ti B.,* 762 A.2d 20, 30 (D.C.2000) (quoting *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)).[17]

### B. Rulings Relating to Allegations of Conspiracy/Joint Venture

We turn next to Coulter's contention that the trial court erred in granting, in part, the defendants' motion to preclude evidence and argument of an agency relationship, joint venture, or conspiracy between the defendants. As we understand it, the gravamen of the argument that Coulter intended to present was that Dr. Fullum created false records and correspondence to "shelter Dr. Taylor" and to assist in covering up Dr. Taylor's alleged negligence. In addition, Coulter's First Amended Complaint alleges that (but does not explain how) Dr. Asomani "acted on behalf of Dr. Taylor and Gerald Family Care," that Dr. Taylor "acted by and

---

But the court's confidentiality order went far beyond an order to seal the record, which would have restricted access to case proceedings and documents without preventing dissemination of information that happens to appear in the case record.

17. In addition, any modified order must clarify how, if at all, it will apply to the parties that have been dismissed from the case.

through Dr. Asomani," and that Dr. Fullum "act[ed] on behalf of" Dr. Taylor, Gerald Family Care, and Dr. Asomani.

The first amended complaint did not include a conspiracy claim, but, after defendants filed their motion in limine, Coulter proposed, in an oral motion, to amend her complaint to include such a claim. For reasons similar to those discussed *supra* with reference to Coulter's motion to amend her complaint to add allegations of sexual misconduct, we conclude that Judge Combs Greene did not abuse her discretion in denying the motion to amend the complaint to add conspiracy allegations. Having denied that amendment, she also did not abuse her discretion in precluding Coulter from introducing evidence of conspiracy.

■ Even assuming *arguendo* that the trial court erred in granting the defendants' motion in limine to preclude evidence that Dr. Fullum and Dr. Asomani acted as agents of Dr. Taylor and Gerald Family Care, or in joint venture with them, to "hide" evidence that Dr. Taylor breached the standard of care, we conclude that any such error was harmless. As we explain *infra,* Coulter failed to present expert testimony that Dr. Taylor (or Gerald Family Care or Dr. Asomani) breached the standard of care and thereby caused injury to Coulter. Thus, there was no basis upon which a jury could have found any of the defendants vicariously liable for medical malpractice in connection with acts or omissions by Dr. Taylor. *Cf. Hill v. Medlantic Health Care Group,* 933 A.2d 314, 334 (D.C.2007) ("civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort") (citation and internal quotation marks omitted).

### C. Other Pre–Trial Rulings

■ Coulter argues that the trial court abused its discretion in granting Dr. Fullum's motion to preclude evidence and arguments at trial regarding his alleged failure to timely produce Coulter's medical records during discovery. At a hearing on the motion, Coulter's counsel explained that he intended to use various requests he had written to Dr. Fullum for Coulter's medical records, as well as Dr. Fullum's allegedly delayed written responses to those requests, to show Dr. Fullum's lack of credibility. Judge Combs Greene expressed concern that, if evidence about the correspondence was introduced, Coulter's counsel might have to take the stand in order to rebut Dr. Fullum's testimony on the issue, implicating Rule 3.7 of the Rules of Professional Conduct ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where . . . [t]he testimony relates to an uncontested issue"). D.C. RULES OF PROFESSIONAL CONDUCT R. 3.7(a)(1) (2007). The court's concern was well-founded. *See R.D. ex. rel. Kareem v. District of Columbia,* 374 F.Supp.2d 84, 91 (D.D.C.2005) (explaining that, per Rule 3.7(a)(1), an individual must "choose between testifying under oath or serving as counsel" and "will not be permitted to do both"). As Coulter has not shown how the court's ruling hampered her from proving that Dr. Fullum breached the standard of care in diagnosing and treating Coulter's cancer, we have no cause to disturb the court's ruling.

■ Judge Combs Greene also granted, in part, Dr. Fullum's motion in limine to preclude evidence and argument related to the integrity of his record-keeping. Coulter argues that the court's ruling improperly "precluded arguments that the bad record keeping was a causal factor" in the allegedly negligent care that she received. However, nothing in the record suggests that Coulter would have been able to elicit testimony about such a causal

relationship. As Judge Combs Greene noted, "electronic record keeping" was "beyond the scope of the proffer" for Dr. Woodyear. Dr. Pennanen did not state in her deposition that she would offer an opinion as to medical record-keeping. And, while Dr. Abel, the other expert that Coulter called at trial, stated in his deposition that Dr. Fullum's record-keeping "did not meet the standard of care," Dr. Abel also stated that he could not testify to a reasonable degree of medical certainty that any deficiency in Dr. Fullum's record-keeping caused any delay in Coulter's treatment. Accordingly, we cannot conclude that the trial judge abused her discretion in granting the motion in limine or that Coulter was prejudiced by that order.[18]

Finally, Coulter argues that the trial court erred in granting, in part, Dr. Fullum's motion in limine to preclude evidence and argument that Dr. Fullum violated Coulter's right to confidentiality by corresponding with Dr. Taylor about her case. The court granted the motion in so far as it sought "to prevent any argument that defendant's alleged violation of plaintiff's right to privacy was the proximate cause of any damages to plaintiff."[19] As appellees argue, the invasion of an individual's right to privacy and the breach of a confidential relationship are independent torts, neither of which Coulter alleged in her first amended complaint.[20] See Vassiliades v. Garfinckel's, 492 A.2d 580, 587 (D.C.1985) ("The District of Columbia has long recognized the common law tort of invasion of privacy"); Street v. Hedgepath, 607 A.2d 1238, 1246 (D.C.1992) ("This court ... has recognized a cause of action in tort for a breach of the confidential physician-patient relationship, based on the statutory privilege and on certain licensing statutes which generally prohibit physicians from disclosing patient treatment"). The court's ruling was justified on the ground that the precluded evidence and argument were not relevant to the claims presented in the amended complaint, and, moreover, were issues as to which defendants did not have sufficient notice. Additionally, Coulter has not explained how any alleged breach of confidentiality delayed her diagnosis and treatment, or how the preclusion of evidence and argument about a breach of confidentiality impeded her presentation of evidence that defendants negligently delayed diagnosis and treatment of her cancer.

## IV. Obstructing or Precluding the Testimony of Various Witnesses

Coulter argues that the trial court abused its discretion in "block[ing] Coulter's efforts to obtain expert testimony" from various witnesses that Coulter questioned or wished to call. We preface our analysis with a discussion of the expert testimony that is relevant and required in a medical malpractice action in this jurisdiction.

"The plaintiff in a medical malpractice case bears the burden of proof on

---

18. As to whether Coulter could refer for impeachment purposes to Dr. Fullum's alleged falsification of documents relating to Coulter's care, Judge Combs Greene ruled that she would deal with the issue as it arose as trial. Coulter does not appear to claim that the court limited Coulter's use of Dr. Fullum's records for impeachment purposes.

19. The court's ruling did allow Coulter to present such evidence and argument for impeachment purposes.

20. We note that the court had earlier denied Coulter's motion to amend her complaint to add allegations of misuse of personal information. Coulter does not specifically complain about the denial of that motion.

three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1244 (D.C. 1997) (citation and internal quotation marks omitted). "Each of these elements must usually be proved by expert testimony." *Id.*, citing *Cleary v. Group Health Ass'n*, 691 A.2d 148, 153 (D.C.1997) ("Generally, in a medical malpractice negligence action, the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries") (citations omitted).

 "The personal opinion of [a] testifying expert as to what he or she would do in a particular case . . . is insufficient to prove the applicable standard of care." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C.2006) (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)). Rather, the testifying expert must establish that the relevant standard of care is followed nationally, "either through reference to a published standard, discussion of the described course of treatment with practitioners outside the District at seminars or conventions, or through presentation of relevant data." *Strickland, supra*, 899 A.2d at 773–74 (internal punctuation and citations omitted); *Snyder v. George Washington Univ.*, 890 A.2d 237, 241 n. 3 (D.C.2006) (standard-of-care "testimony must reflect some evidence of a national standard, such as attendance at national seminars or meetings or conventions, or reference to published materials, when evaluating a medical course of action or treatment"). Further, an expert's educational and professional background is not sufficient to demonstrate that he is familiar with the national standard of care. *Strickland, supra*, 899 A.2d at 774; *Nwaneri v. Sandidge*, 931 A.2d 466, 467 (D.C.2007) ("Dr. Woratyla's expertise in the field of vascular surgery, standing alone, without specific testimony or evidence in the record establishing the basis for his knowledge of the national standard of care . . . was insufficient to lay the proper evidentiary foundation to allow Dr. Woratyla to give expert opinion testimony that appellant deviated from the standard of care"). Where the expert makes "no attempt to link his testimony to any certification process, current literature, conference or discussion with other knowledgeable professionals," there is no "basis for his discussion of the national standard of care." *Strickland, supra*, 899 A.2d at 774.

 " '[I]t is insufficient for an expert's standard of care testimony to merely recite the words 'national standard of care.' " *Strickland, supra*, 899 A.2d at 773 (quoting *Hawes v. Chua*, 769 A.2d 797, 806 (D.C.2001)). On the other hand, the fact that an expert "did not expressly use the words 'national standard' when stating his expert opinion does not, in itself, render his opinion inadmissible"; rather, "[o]ur primary concern is whether it is reasonable to infer from [the] testimony that such a standard is nationally recognized." *Snyder, supra*, 890 A.2d at 245 (citations and internal quotation marks omitted). Once an expert "explicitly indicate[s] the basis for his or her knowledge of the national standard of care," he may state what the national standard of care is. *Hill, supra*, 933 A.2d at 328 (emphasis omitted). It is counsel's duty to lay the necessary foundation to establish that an expert is competent to testify about the national standard of care. *Id.*

 The trial judge "has wide latitude in the admission or exclusion of ex-

pert testimony, and his or her decision with respect thereto should be sustained unless it is manifestly erroneous." *Hawes, supra,* 769 A.2d at 801 (internal punctuation and citation omitted). "[A] trial judge is not obliged to qualify a proffered expert when there are articulable reasons to doubt his competency." *Glorious Food v. Georgetown Prospect Place Assocs.,* 648 A.2d 946, 948 (D.C.1994).

### A. Plaintiff's Experts

#### 1. Dr. Woodyear

■ Coulter first sought to present standard-of-care testimony by Dr. Woodyear, whom Coulter offered as an expert with respect to, *inter alia,* the handling of breast cancer complaints by primary care physicians and the scheduling of diagnostic procedures. After Coulter's counsel had questioned Dr. Woodyear at length during voir dire, the court ruled that he would not be permitted to testify. Coulter now complains that the trial court obstructed her effort to establish Dr. Woodyear's qualifications "by disallowing questions and answers pertinent to his qualifications and by harassment." We reject that claim as well as Coulter's claim that the trial court improperly precluded Dr. Woodyear from giving standard-of-care testimony.

It is true that the trial court sustained many of the steady barrage of objections that defendants' lawyers raised to questions that Coulter's counsel posed to Dr. Woodyear. But, the transcript shows, those rulings were occasioned by questions that persistently were vague or ambiguous, or that lacked foundation, called for speculation, had already been asked and answered, or sought answers about legal concepts,[21] or that attempted to lead the witness "toward the definition" [of "standard of care"] that he couldn't give in his "deposition."[22] The court also struck a number of Dr. Woodyear's answers because they were non-responsive or because, in his answers, Dr. Woodyear gave expert opinions before he had been accepted to testify as an expert. But the court also overruled a number of defense counsel's objections (stating, *e.g.,* that Coulter's counsel "has to start somewhere")[23] and several times the court attempted to assist Coulter's counsel, instructing him to "fix [his] question" or to "make it more specific" or to "take another stab." On this record, we cannot agree that the court improperly obstructed Coulter's presentation of evidence.

■ Judge Combs Greene provided a detailed explanation of her ruling that Coulter had failed to establish a foundation for Dr. Woodyear to give standard-of-care testimony.[24] We need not discuss all as-

---

21. Much the same is true of the court's rulings on objections raised during Coulter's questioning of her other witnesses.

22. The parties' Appendix contains only one page of Dr. Woodyear's deposition testimony, so we are unable to confirm the validity of this objection.

23. The trial judge also acknowledged overruling a number of defense objections that were "technically ... correct" but that, if sustained, would have precluded one of Coulter's witnesses from "getting to what he wants to say."

24. For example, the court explained that when Coulter's counsel asked Dr. Woodyear to "tell us about" the "national standard of care concerning family practice," Dr. Woodyear responded:

Family doctors have a duty to provide basic care to their patients in a competent and professional manner which is the first rule of medicine ... above all do no harm. That is the rule that all doctors have to practice under.... Family doctors are required to have a fund of knowledge that is adequate to treat all of the patients that come to their office to the degree of that fund of knowledge beyond which they are

pects of her ruling. It suffices to note that, although Dr. Woodyear described his extensive experience in performing breast examinations and referring patients with breast cancer complaints, nothing in his testimony established that he attended national conferences, or kept current with pertinent medical literature, from which he would be familiar with the *national* standard of care.[25] *Cf. Nwaneri, supra,* 931 A.2d at 471 (referring to attendance at national meetings and keeping current with the state of the medical art as a "minimally sufficient" foundation for giving standard-of-care testimony) (quoting *Hawes, supra,* 769 A.2d at 808). Accordingly, the trial judge did not err in ruling that he would not be permitted to offer standard-of-care testimony. Nor—in light of the trial court's "wide latitude in the admission or exclusion of expert testimony," *Hawes, supra,* 769 A.2d at 801—can we say that the trial judge abused her discretion in ruling that although Dr. Woodyear could "perhaps qualify as an expert in family care medicine," his inability to give standard of care testimony "would confuse the jury and call for the jury to speculate" since "what would happen is he would be called upon to opine about Dr. Taylor's actions or inactions or his care ... but he wouldn't be able to talk about

whether that fell below the standard required."

### 2. Dr. Abel

Coulter offered Dr. Abel, a physician who is Board-certified in internal medicine and oncology, as an expert in the medical evaluation and care of breast abnormalities. Coulter's counsel proffered that Dr. Abel would testify that "had proper measures been pursued" when Coulter was seen by Dr. Taylor at Gerald Family Care, Coulter's breast cancer "would have been identified." Defense counsel objected to Dr. Abel's qualification to offer standard-of-care testimony on the grounds, *inter alia*, that his practice does not entail evaluating patients who present for the first time with breast complaints. The trial court ruled that Dr. Abel could present expert testimony about "oncology generally," but deferred ruling on whether he could address standard-of-care issues.

■ Whether Dr. Abel was qualified to testify on standard-of-care issues presents a somewhat closer question than did the same issue with respect to Dr. Woodyear. As our case law establishes, Dr. Abel was not incompetent to testify as an expert on standard-of-care issues affecting defendants "merely because he is not a special-

---

to refer to specialist for additional specialized care that is outside of the scope of the family doctor.

The court correctly observed, "That's not a national standard of care.... That's just sort I guess what you need to be considered a competent doctor. It does not speak to any specifics about a national standard of care in a specific field."

25. Coulter argues that the court applied "a more stringent criterion" to Coulter's experts than to defense expert Dr. Zuurbier. We disagree. Dr. Zuurbier, a radiologist with a subspecialty in breast imaging, testified *inter alia* about her academic appointments at Harvard University and Georgetown University medical schools, her publication of numer-

ous journal articles and book chapters on breast imaging and radiology, her regular practice of reading medical journal articles and texts, the more than thirty presentations she had given on breast imaging in various locations in the United States and abroad, her attendance at radiology and breast imaging seminars, her conduct of grant-funded professional research on breast imaging, and her appearances on national network news and interview programs to discuss mammography, screening and breast imaging, all as the basis of her familiarity with the standard of care for interpretation of radiographic breast imaging and for when breast imaging is or is not required.

ist in the particular field of which he speaks." *Haidak v. Corso,* 841 A.2d 316, 323 (D.C.2004) (quotation marks and citations omitted). And, Dr. Abel did testify that he attends "interdisciplinary breast conferences" where practitioners in various medical specialities present "all of the new or current cases of breast cancer and the cases are discussed among the different specialities to promote effective management" and discuss the "techniques" and "technologies used" in the "evaluation of breast abnormalities." At least arguably, this testimony provided a minimally sufficient foundation for him to give standard-of-care testimony. *Cf. Nwaneri, supra,* 931 A.2d at 473 (listing "discussion with other knowledgeable professionals" in a list of credentials "*any* of which would have been legally sufficient to establish a basis for [expert's] discussion of the national standard of care") (emphasis added). However, we need not pause over whether it was error to preclude Dr. Abel from presenting standard-of-care testimony as to Dr. Taylor and Gerald Family Care, because it appears from the record that neither Dr. Abel nor any of Coulter's other witnesses would present causation testimony as to these defendants (or as to Dr. Asomani). Defense counsel advised the court—in stark contrast to the proffer that Coulter's counsel made as to the doctor's expected opinion testimony at trial—that in his deposition Dr. Abel testified that he would not opine as to whether Coulter had a palpable lump at the time she saw Dr. Taylor in 2001, or whether a lump would have been detected by mammogram at

that time, or whether Coulter had a breast tumor at that time.[26] Even if we assume that the trial court erred in precluding testimony by Dr. Abel that Dr. Taylor and Gerald Family Care breached the standard of care, the portions of the record available to us suggest that the error was harmless with respect to Coulter's ability to prove the elements of her case against these defendants and afford us no basis for disturbing the court's ruling.

### 3. Dr. Haines

▊▊▊▊ Explaining to the court that Dr. Joe D. Haines, a family care practitioner, was out of the country and not available to testify at trial, Coulter's counsel asked the court to permit him to read into the record pertinent portions of Dr. Haines's deposition testimony. Dr. Haines had testified during his deposition that all of the defendants violated the standard of care by not ordering, or by their delay in ordering, a mammogram. Having read the portions of Dr. Haines's deposition transcript that defendants offered, the court denied Coulter's request. The court observed that Dr. Haines had offered "only personal opinion," acknowledged explicitly that he was "not able to testify to standard of care," and, when asked about pertinent literature on mammograms, was unable to cite any.[27] Coulter now argues that "other wrongfully excluded evidence" or the testimony of defendants' experts "may have shown that Dr. Haines' opinion was nationally recognized." However, it was Coulter's "counsel's duty to lay the

---

**26.** The Appendix contains only several pages of Dr. Abel's deposition, so we are unable to confirm the accuracy of this characterization of Dr. Abel's deposition testimony.

**27.** For example, when asked at his deposition about any literature he relied on for the standard of care with regard to referring patients for mammograms, Dr. Haines testified, "I

usually rely on ... my surgical associates ... that I've been affiliated with for over 20 years." Asked what medical texts he relied on for his opinion that Dr. Asomani violated the standard of care by not promptly ordering a mammogram, Dr. Haines said that he relied on "[t]he text of common sense and good medical practice."

necessary foundation" for Dr. Haines's testimony to be admitted as standard-of-care testimony.[28] *Hill, supra,* 933 A.2d at 328. Coulter's counsel failed to lay that foundation, and so the trial court did not err in excluding his testimony.[29]

### D. Other Witnesses

■ Coulter further argues that the trial judge precluded her from establishing defendants' liability by relying on the testimony of Drs. Taylor, Fullum, Asomani, and Zuurbier. As to Drs. Taylor and Fullum, she argues that Judge Combs Greene improperly precluded her from questioning them as experts and as adverse parties pursuant to Super. Ct. Civ. R. 43(b). Coulter is correct that our law permits a party to question an adverse party's witnesses and to seek to elicit from them testimony to meet the plaintiff's burden of proof. *See* Super. Ct. Civ. R. 43(b); *see also Abbey, supra,* 483 A.2d at 333 ("The adverse witness statute of the District of Columbia states that a party or a party's witness in a civil suit may be called as a witness by his adversary and questioned as to matters relevant to the dispute at issue"). And (contrary to what Coulter's

brief suggests), Judge Combs Greene explicitly recognized that Coulter's counsel could lead an adverse witness. However, the foregoing authorities do not obviate the need for a witness to be accepted by the court as a standard-of-care expert before standard-of-care testimony may be elicited.[30] We note that the court did not put a time limit on the questioning of Dr. Taylor or Dr. Fullum by Coulter's counsel, and that Coulter's counsel told the court that he had "nothing further" for the witnesses without seeking to qualify them as standard-of-care experts[31] and then asking other questions that (he now contends) might have assisted in Coulter's case.

Coulter complains that the court entered a directed verdict before she had an opportunity to call Dr. Asomani. But, when the court was considering the oral motion for a directed verdict, Coulter's counsel pleaded with the court to allow him to call only Dr. Pennanen and Coulter herself. We see no indication in the record that Coulter's counsel expressed an intent to call Dr. Asomani. *Cf. Berkow v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries Conducting Sibley Mem'l Hosp.,* 841 A.2d 776, 780 (D.C.2004) (re-

---

**28.** It is true, as Coulter argues, that a plaintiff may prove a prima facie case of medical negligence through a defendant physician or through defense witnesses. *See Abbey, supra,* 483 A.2d at 334. However, Coulter's counsel did not advise the court of any intent to call any of defendants' designated experts as part of Coulter's case-in-chief, and the court was not obliged to require defendants to present their case before deciding whether Dr. Haines's deposition testimony could be admitted.

**29.** Moreover, the court had questioned whether Coulter had done all that was required either to verify that Dr. Haines was truly unavailable or to secure his testimony through a *de bene esse* deposition.

**30.** It was permissible for Coulter to ask Dr. Fullum questions that attempted to draw on the doctor's expertise as a "participant[ ] in

the events leading to this lawsuit." *Abbey,* 483 A.2d at 335. At least arguably, Coulter's question to Dr. Fullum, "When did [Coulter] first develop cancer?" was such a question, that should have been allowed over the ensuing defense objection. But Coulter can point to no harm from the court's having sustained the objection, because Dr. Fullum actually managed to answer, "I don't know" before the court had a chance to rule on the objection.

**31.** We note that, on cross-examination, Dr. Fullum's counsel asked Dr. Fullum several questions about his teaching appointments and publications, eliciting information that may have enabled the court to qualify him as a standard-of-care expert if a request had been made.

jecting plaintiff's claim that he should have been permitted to rely on an examination of the defendant to establish the standard of care because, among other things, he "never notified the defendants that he intended to do so"). Moreover, "there is no record basis ... for believing that [Coulter] could have used [Dr. Asomani] to establish the standard of care and defendants' departure from it." *Id.*

Regarding Dr. Zuurbier, Coulter argues that the trial court "erroneously barred" her from meeting her burden of proof by asking Dr. Zuurbier "to apply Zuurbier's standard of care to Coulter's theory of liability: that Dr. Taylor examined the breast by manipulation [sic] the breast with one finger and stating that it was a harmless cyst." We think, however, that the error, if there was any, did not prejudice Coulter. We are satisfied from our review of the transcript that Dr. Zuurbier was not prepared to endorse Coulter's theory. Dr. Zuurbier stated that she had "no comment on the manner in which [Dr. Taylor] did [the examination of Coulter's breast], only the scope of the examination" and that she could not speak to the quality of the examination. Coulter also complains that the court curtailed her questioning of Dr. Zuurbier. But, in the example that Coulter cites, it seems likely that Judge Combs Greene sustained a defense objection to a question that Coulter's counsel put to Dr. Zuurbier not because the judge was precluding Coulter from relying on the expertise of the defense's designated experts, but because the question— whether "all doctors have the same level of skill in conducting a breast examination"— called for speculation.

In sum, we are not persuaded by Coulter's arguments that she improperly was precluded from establishing her *prima facie* case through the testimony of Drs. Woodyear, Abel, Taylor, Fullum, Asomani, Haines, and Zuurbier.

## V. The Directed Verdicts and the Anticipated Testimony of Dr. Pennanen

On the fourth day of trial, all of the defendants moved for directed verdicts,[32] arguing that Coulter would not be able to establish through expert testimony a breach of the national standard of care or causation. As already described, Coulter's expert Dr. Woodyear was not permitted to testify beyond voir dire, her expert Dr. Abel was qualified to provide expert testimony only as to oncology and not as to any breach of the national standard of care, and Coulter was not permitted to read the deposition testimony of Dr. Haines into the record. The other witnesses that Coulter had presented—Dr. Taylor and Dr. Fullum—did not acknowledge that they had breached the national standard of care. Coulter planned to call one more expert, surgeon Dr. Pennanen, and possibly a lay witness (Ms. Thomas), and she planned to testify herself. Dr. Pennanen had been engaged to provide expert testimony regarding the care by Dr. Fullum only.

Coulter's counsel argued that directed verdicts would be premature because (1)

---

**32.** Super. Ct. Civ. R. 50(a)(1) states that:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on that issue, the Court may determine the issue against that party and may grant a motion for judgment as a matter of law.

A verdict may be directed "only if it is clear that the plaintiff has not established a prima facie case." *Snyder, supra,* 890 A.2d at 244 (citation and internal quotation marks omitted).

Coulter would testify that Dr. Taylor examined her breast with one finger, (2) there was "ample testimony as to what the standard-of-care breast examination consist[s] of,"[33] and (3) the jury could find that Dr. Taylor "was careless," both in the method that he used to examine Coulter's breast and by not "re-examining the lump"[34] during Coulter's subsequent visits to him. But, to prevail, Coulter was required to show that any deviation by Dr. Taylor from the standard of care caused damages, and Coulter had no witness who testified (or, in the case of Dr. Pennanen, would testify) that any negligence by Dr. Taylor in August 2001 worsened Coulter's prognosis, caused her to need a more invasive treatment, or otherwise contributed to her injury. Similarly, although Coulter argues that the jury could have found that Dr. Asomani "did not expedite ... Coulter's referral [to] specialist care," Coulter had no witness who testified (or would testify) that any delay on Dr. Asomani's part either breached the standard of care or was a cause of Coulter's damages.

Conducting a de novo review of whether Coulter established a prima facie case, see Snyder, supra, 890 A.2d at 245, we conclude on this record that directed verdicts were warranted as to Gerald Family Care and as to Drs. Taylor and Asomani. It was clear that Coulter would not be able to meet her burden of proof as to any of these defendants/appellees through the testimony of her remaining, lay witnesses. Even though Coulter did not complete presentation of her case-in-chief, we are satisfied that, as to the potential liability of these defendants, she was "fully heard." Super. Ct. Civ. R. 50(a)(1); see also Super. Ct. Civ. R. 50(a)(2) (providing that a motion for judgment as a matter of law "may be made at any time before submission of the case to the jury"). Accordingly, we affirm the entry of the directed verdict as to defendants/appellees Gerald Family Care, Dr. Taylor, and Dr. Asomani.

 Our resolution as to Dr. Fullum requires some additional background explanation, both about the expected testimony of Dr. Pennanen[35] and about the colloquy that led to the trial court's ruling that prevented her from testifying and to the directed verdict. As we explain infra, taken together, Dr. Pennanen's (anticipated) testimony about the expedited diagnostic procedures that the standard of care required in the absence of extenuating patient circumstances; Dr. Fullum's testimony about his reason for not expediting performance of those diagnostic procedures (which was that there was no "rush") and his failure to identify any extenuating patient circumstance that necessitated delay; and Dr. Pennanen's (anticipated) testimony about the adverse impact that the delay had on Coulter's prognosis, would have enabled Coulter to establish prima facie a case of medical malpractice by Dr. Fullum. We are also satisfied that, contrary to the representations that Dr. Fullum's counsel made to the trial judge, Dr. Fullum would not have been "ambushed" had Dr. Pennanen been permitted to testify. We therefore conclude that the

---

**33.** Both Dr. Taylor and Dr. Abel had testified about how a breast examination is conducted.

**34.** Dr. Taylor had testified that he found no lump during Coulter's initial visit.

**35.** In the discussion that follows, we summarize pertinent portions of Dr. Pennanen's deposition testimony and Dr. Fullum's trial testimony in the light most favorable to Coulter, who, for purposes of her challenge to a directed verdict, "must be given the benefit of all reasonable inferences to be drawn from the evidence." Abebe v. Benitez, 667 A.2d 834, 836 (D.C.1995); see also Snyder, 890 A.2d at 245 (viewing expert's testimony in the light most favorable to plaintiff against whom directed verdict was entered).

trial court should have permitted Dr. Pennanen to testify, notwithstanding her statement during her deposition that she would not offer an opinion that Dr. Fullum deviated from the standard of care.

Dr. Pennanen testified at her deposition that she is an Associate Professor on the faculty at Georgetown University Medical Center and a breast surgeon specializing in "breast disease diagnosis and treatment." She spends the majority of her time in the clinical care of patients, does research on "breast cancer prevention, diagnosis and treatment and breast cancer risk assessment," and teaches and publishes in those same areas. Dr. Pennanen characterized the findings of Coulter's ultrasound from December 2002—which "measur[ed] something discrete" and showed "echogenic irregularity" in the left breast—as "abnormal," "an indication of something that possibly might not be benign." She explained that in this situation, the procedure called for "wouldn't be a screening mammogram . . . because she has an abnormality. So it would be a diagnostic mammogram. A screening mammogram is for someone who is asymptomatic." Having reviewed Coulter's medical records, Dr. Pennanen testified that "there were significant delays specifically from the time [Coulter] initially saw Dr. Fullum until her mammogram was obtained and then again from the time of her post-operative visit after the biopsy when the pathology of the biopsy was available until she had her definitive surgery, the mastectomy." She stated that "the standard of care for the length of time between the initial surgical consultation visit and the time of a mammogram in a patient such as Sanya Coulter" is "[w]ithin two to three weeks." [36] Of particular significance,

she explained that more than two weeks "would be unusual . . . unless there was some kind of extenuating circumstance like the patient was out of town and did not choose to schedule it then." She also explained that "you can get a report on a mammogram the same day that it is done." The following exchange occurred between Coulter's counsel and Dr. Pennanen:

Q: Dr. Fullum said that on January 30th he went out and told his office staff people to schedule this thing for a screening mammogram instead of a diagnostic mammogram. Given those circumstances, did that make any sense?

A: No.

Dr. Pennanen further testified that it is "likely that if [Coulter] had been treated at an earlier time, her prognosis would be different"; that it is "probable that the number of involved [lymph] nodes increased . . . between January and June [the time period when Coulter was under Dr. Fullum's care]," and is "likely that the tumor increased in size between January and June," putting Coulter in a different prognostic category; and that "it is likely that [Coulter] had fewer [lymph] nodes involved in the first one to two months" under Dr. Fullum's care, "that she had more nodes involved in the last one to two months," and that the increase "would have a 20 percent detrimental effect on her prognosis." Dr. Pennanen testified in addition that it was "probable" that "Coulter's chance for a five year disease free survival decreased under Dr. Fullum's care." But Dr. Pennanen did not "know the circumstances as to why there was a delay from the time [Coulter] was initially seen by [Dr. Fullum] until she had the mammogram and the same with respect to

36. Asked about "the standard of care for the time that can lapse between the post excisional biopsy visit and the time of the mastectomy

that is ultimately performed," Dr. Pennanen said that a "generous but acceptable amount of time would be one month."

the post-operative visit and her definitive surgery" and therefore could not "say what the cause was or attribute it to Dr. Fullum."

On the morning when Coulter expected to call Dr. Pennanen, Judge Combs Greene inquired into whether Dr. Pennanen would offer an opinion that Dr. Fullum deviated from the national standard of care. Coulter's counsel told the court that Dr. Pennanen's "overall deposition is consistent that Doctor Fullum violated the standard of care." Reading from portions of the deposition transcript, Judge Combs Greene then noted that at Dr. Pennanen's deposition, defense counsel had asked her whether she felt she had the information she required "to come to a conclusion and opinion regarding whether Doctor Fullum complied with the standard of care," and that Dr. Pennanen had responded, "No. .... I know that there were these delays [in scheduling the diagnostic procedures and mastectomy, but] as to why that happened I cannot address that." Judge Combs Greene also noted that in answer to the question "Do you expect to express the opinion at trial that Doctor Fullum violated the standard of care?" Dr. Pennanen said "At this point I do not. I haven't seen Doctor Fullum's testimony and I don't know the details of why there were these delays." The following exchange ensued:

> Coulter's Counsel: Your Honor, the jury has heard Doctor Fullum's testimony and Doctor Pennanen will establish the standard of care and the jury will be able to determine that he was, therefore, negligen[t].
>
> The Court: So if I called her in now and out of the presence of the jury voir dired her she would now surprisingly say that she's going to offer an opinion that Doctor Fullum deviated from the standard of care? ...
>
> Coulter's Counsel: Yes.

The Court: Let's call her in.

At this point in the proceedings, Dr. Fullum's counsel "strenuously object[ed]," telling the court that Dr. Fullum would be "totally ambushed" if Dr. Pennanen was allowed to offer an opinion that she had said, during discovery, she would not give. The following colloquy ensued between Coulter's counsel and the court:

> Coulter's Counsel: There's no ambush Your Honor—
>
> The Court: Oh, there clearly is, ... She's says right here she's not going to offer an opinion. So these folks— [Dr. Fullum's counsel] is thinking on behalf of his client that he doesn't have to deal with that and now a minute before she's supposed to testify you inform me that she is going to offer an opinion.
>
> Coulter's Counsel: She [has] always done so, Your Honor.
>
> The Court: Where is it? Show me in her deposition where it is ....
>
> Coulter's Counsel: Your Honor, in her deposition she set up—she stated that Doctor Fullum unnecessarily—Doctor Fullum delayed the surgery. And whether he was negligent depended upon whether he had reason for that delay.

As the colloquy went on, Judge Combs Greene repeatedly asked Coulter's counsel to show her where in the deposition transcript Dr. Pennanen testified to a deviation from the standard of care. Coulter's counsel responded by asking the court to voir dire Dr. Pennanen or to "read her whole deposition and not rely upon a line." He told the court that during Dr. Fullum's testimony, "Dr. Fullum ... supplied the reason for his delay" and then argued:

> Coulter's Counsel: Your Honor, a Plaintiff is entitled to prove standard of care violations by proving the stan-

dard of care and the Court may then allow the jury to compare the Defendant's conduct against the proven standard of care and the jury can then decide whether there was a violation. It's not necessary that a physician testify specifically that there was a violation, it is sufficient that the physician offer the standard of care and the information—

The Court: You're just wrong—you're just wrong on that, Mr. Shepherd.

The Court then concluded:

Based on the Court's reading of at least this portion of the deposition, the failure of Plaintiff's counsel to advise the Court of any other place in the deposition where there would be testimony that Doctor Fullum deviated from the standard of care, the motion of the Defendant to preclude any now new testimony the Court will grant that motion because it would be surprise testimony, it would be a failure for the Plaintiff to have abided by the rules to supplement any additional opinions by expert testimony and the Court will preclude Doctor Pennanen's testimony.

Thereafter, the court entered a directed verdict in favor of Dr. Fullum.

On appeal, Coulter renews her argument that the trial court erred in not permitting Dr. Pennanen to testify, contending that Dr. Pennanen could have "define[d] the standard of care applicable to Dr. Fullum at trial for the jury to apply to the evidence." Coulter argues that this is a case where "the jury could equally well as the expert, apply the standard to the evidence and determine whether there was a breach or compliance." In light of our case law, the particular facts of this case, and Dr. Pennanen's deposition testimony, we are persuaded by Coulter's argument.

As already discussed, in general, expert testimony is needed to establish that there was a deviation from the national standard of care. That is because, where the claim presented is that plaintiff was injured as a result of the negligent exercise of medical judgment, resolution of the issue generally requires knowledge and judgment that is beyond that of the average jury of lay persons. But the scope of the required expert testimony "depends on the particular issues to be resolved by the trier of fact." *Washington Hosp. Ctr. v. Martin*, 454 A.2d 306, 308 (D.C.1982). In *Martin*, the plaintiff, who had been hospitalized while recovering from hip surgery, alleged that the hospital was negligent in failing to protect her from falling out of bed. We explained that expert testimony would have been necessary to establish negligence if the issue in the case had been "whether the doctor correctly prescribed restraints for appellee or whether the nursing staff applied them properly," because "[t]hose are matters which generally involve professional judgment and skill, and if the exercise of such judgment and skill is at issue, expert testimony would no doubt be needed...." *Id.* We reasoned, however, that as to the central issue of whether the plaintiff "was in fact under restraints immediately prior to her fall," that was not a question "on which expert testimony was either necessary or helpful." *Id.*

We agree with Coulter that a similar analysis is appropriate in this case. As already described, Dr. Pennanen opined that Coulter, referred to Dr. Fullum in December 2002, because of an abnormal sonogram, required a prompt diagnostic mammogram rather than a screening mammogram, and that the standard of care called for obtaining the diagnostic mammogram within a few weeks unless there was some reason for delay, such as the patient's need to be out of town. Dr.

Pennanen was unable to say what had caused the mammogram to be delayed (until March 21, 2003). Coulter's counsel sought to juxtapose Dr. Pennanen's testimony against Dr. Fullum's trial testimony, telling the court—as noted *supra*—that "the jury has heard Doctor Fullum's testimony and Doctor Pennanen will establish the standard of care and the jury will be able to determine that he was, therefore, negligen[t]."

During his trial testimony, Dr. Fullum acknowledged that Coulter has been referred to him for a consultation regarding a breast mass, that he reviewed Coulter's sonogram sometime prior to her initial visit with him on January 30, 2003, and that the sonogram showed echogenic irregularities in the left breast. The jury heard him testify that he directed his staff to schedule Coulter for a "general screening mammogram" to be done "prior to her follow-up appointment in three months," because there was no rush. Scheduling the mammogram within three months was "acceptable" since Dr. Fullum detected nothing that caused him to be concerned and did not view the sonogram, which showed a "mild irregularity," as presenting an emergency.[37]

Had jurors heard Dr. Pennanen's testimony, they could have credited her opinion that, absent extenuating patient circumstances, the standard of care required Dr. Fullum promptly to order a diagnostic (rather than screening) mammogram when he saw the ultrasound showing echogenic irregularities of the left breast. Jurors could then have found on the basis of Dr.

Fullum's (and Coulter's) testimonies that there was no such extenuating patient circumstance that necessitated a delay in scheduling of the mammogram. Rather, the jury could have found, the delay was attributable to a breach of the standard of care entailed in Dr. Fullum's failure to order an expedited diagnostic procedure. *Cf. Ferrell v. Rosenbaum*, 691 A.2d 641, 649 (D.C.1997) ("Although Dr. Rosenbaum did not make an admission as to the ultimate issue of breach of the standard of care, he testified that the fact that his notes did not indicate that he had seen the blood work probably meant that he had not reviewed the blood data. This testimony was enough to raise a question of material fact as to breach of the standard of care.... Dr. Rosenbaum's deposition testimony, in the context of the expert testimony concerning the applicable standard of care, was sufficient to defeat summary judgment.").

Whether Coulter "was out of town" or presented some other "kind of extenuating circumstance" that necessitated a delay in scheduling the mammogram—the "particular issue[ ] to be resolved by the trier of fact" in determining whether there was a breach of the standard of care, *Martin, supra,* 454 A.2d at 308—was an issue that the jury was competent to handle, without the need for expert testimony that went beyond what Dr. Pennanen offered during her deposition.[38] It was not necessary for Coulter's case that Dr. Pennanen state definitively that Dr. Fullum violated the standard of care.[39] *Cf. Kaminski v.*

---

**37.** Coulter also testified at her deposition that Dr. Fullum ordered a general screening mammogram.

**38.** As in *Martin,* where the issue was whether the patient had actually been placed in restraints, the issue of whether Coulter was "out of town," chose to delay her mammogram, or presented some other "extenuating

circumstance" was not one for which "expert testimony was either necessary or helpful." *Martin,* 454 A.2d at 308.

**39.** That said, there is also the possibility that, if permitted to testify at trial and if apprised of Dr. Fullum's trial testimony about there being no reason to rush in scheduling a diag-

*Duane,* 754 D.2d 375, 1984 U.S.App. LEXIS 13531, *3 (6th Cir.1984) (applying state law that "does not require the expert witness to state explicitly that the defendant violated an applicable standard of care so long as the expert provides sufficient evidence of prevailing standards and the jury has other evidence which demonstrates that a departure from the standards of care actually did occur"), citing *Baldwin v. Williams,* 104 Mich.App. 735, 306 N.W.2d 314, 316 (1981) ("this Court has not required that an expert witness testify that a breach has occurred in a case where the expert stated the applicable standard of care and other factual testimony elicited at trial established what procedure was actually followed by the defendant"); *Knutson v. Sand,* 282 A.D.2d 42, 725 N.Y.S.2d 350, 355 (N.Y.App.Div.2001) (reasoning that where an expert explained the standard of care, and other evidence established that the defendant did not comply with that standard, the jury had all the information it needed to make a finding of breach); *Ewing v. Alexander,* 93 Mich.App. 179, 285 N.W.2d 808, 812 (1979) (reasoning that a malpractice plaintiff's expert witness need not expressly testify that the defendant violated the applicable standard of care, so

long as the witness provides enough information to justify that inference by a factfinder).[40]

From Dr. Pennanen's (anticipated) testimony, the jury could also have found that the diagnostic delay at the front end of the January–to–June 2003 period when Coulter was under Dr. Fullum's care was a substantial factor that led to, and thus was proximate cause of, Coulter's worsened prognosis. *Cf. Ferrell,* 691 A.2d at 652 (concluding that where the evidence "demonstrated that the claimed negligence was a substantial factor in the loss of [patient's] best chance for survival," the "trial court's conclusion that [plaintiff] did not make a prima facie showing of proximate cause was erroneous"). For these reasons, we conclude that, had the trial court been adequately apprised of the discovery record, it would not have been justified in precluding Dr. Pennanen from testifying, and it should not have directed a verdict in favor of Dr. Fullum.

We emphasize that our analysis has focused on whether Coulter, permitted to call Dr. Pennanen to give testimony "of a piece with" her deposition testimony, *Weiner,* 557 A.2d at 1310, could have established prima facie that Dr. Fullum

---

nostic mammogram, Dr. Pennanen could have testified, in a manner "consistent with [her] original theory," that the delay in scheduling was a breach of the standard of care. *Weiner v. Kneller,* 557 A.2d 1306, 1310 (D.C. 1989) (explaining that a party need not describe in a Rule 26(b)(4) statement "every possible direction his expert's testimony could take," and observing that courts "have generally allowed experts to state the natural concomitants of their arguments, ... when they have been satisfied that such testimony was of a piece with the original theory").

**40.** In *Ewing,* a patient alleged that her physician and nurses had departed from professional norms when they allowed her to walk unassisted while she was on sedative medication. 285 N.W.2d at 809. Plaintiff's expert, Dr. Groat, testified at deposition that the

physician "would be responsible for the fall if he had encouraged this patient to ambulate without help." *Id.* at 812. However, Dr. Groat "could not state flatly that the defendants were negligent" because "he had no personal knowledge as to whether [plaintiff] had been in fact allowed to walk unattended or did so against the orders of defendants." *Id.* Reversing the trial court's grant of summary judgment to defendants, the court of appeals opined that "the expert need not state unequivocally that malpractice has occurred" in order for the claim to proceed to trial. *Id.* Rather, the expert need state only "an opinion of the requisite standard of care and a judgment that certain facts proposed to him do or do not implicate compliance with that standard." *Id.*

breached the standard of care in scheduling her mammogram and that this breach resulted in damages (not caused by extenuating circumstance attributable to Coulter). We have not discussed whether Dr. Pennanen's testimony could have enabled Coulter to establish that Dr. Fullum breached the standard of care in scheduling Coulter's mastectomy after he had obtained the mammogram and biopsy results. Dr. Fullum testified at trial (and Coulter acknowledged at her deposition) that one reason for delay between the biopsy results and the surgery was Coulter's having been "very upset" upon hearing the results, needing "time . . . to come to grips with the diagnosis," and not being "in a position, at that particular time, to make any decisions regarding her care." Dr. Fullum explained that another reason for delay was that he wanted Coulter to obtain a second opinion before undergoing surgery and to have a "metastatic workup" to detect any spread of cancer to the liver, spleen, lungs or bones. Whether the delay in scheduling the surgery in order to obtain a second opinion and metastatic workup was consistent with the standard of care is an issue that calls for professional judgment. The record provides no indication of what Dr. Pennanen would have said about either reason for delay. Possibly, she might have clarified that the one-month between biopsy and mastectomy that she specified as the outside limit (absent extenuating circumstances) already took into account the time required for both. But, again, the record on this point seems inadequate. Thus, we do not suggest that Coulter would have been able to establish a prima facie case that Dr. Fullum breached the standard of care with respect to scheduling the surgery, in the absence of explicit testimony to the effect that delay for a metastatic workup and

second opinion, under the circumstances here, amounted to such a breach.

The point of our lengthy foregoing analysis, however, is that Coulter might have been able to show that the delay in obtaining the mammogram (and subsequent biopsy) so delayed the surgery that even if Fullum had operated forthwith after the biopsy, the damage was already done. Dr. Pennanen testified in her deposition that Coulter had fewer lymph nodes involved in the first one to two months of the January–to–June 2003 period, meaning, as we understand her testimony, that surgery by the end of March would likely have resulted in a much more favorable prognosis. So, even if Coulter did not have expert testimony to show damages from Dr. Fullum's post-biopsy conduct, it was possible that she still could make out a prima facie case of medical malpractice, on the ground that the front-end delay was the proximate cause of her injury.

This does not end the matter, as we still must deal with the fact that Coulter's counsel—though asked repeatedly by the court to point to the relevant portions of Dr. Pennanen's deposition transcript—did not point the court to all of the portions that we have summarized or quoted above. Thus, at least arguably, Coulter invited the error of which she complains.

We conclude that Coulter's failure to apprise the court fully about the content of Dr. Pennanen's testimony should not foreclose correction of the error now. First, it is necessary to read, in context, several lengthy portions of Dr. Pennanen's deposition to capture the opinions she expressed about the standard of care, deviation from it, and causation. We are doubtful that the trial court would have been able fully to appreciate the significance of Dr. Pennanen's testimony by looking at a few short passages during the bench confer-

ence that led up to the directed verdict.[41] Second, Coulter's counsel did plead with the court to voir dire Dr. Pennanen or to read her whole deposition before ruling, and did attempt to explain to the court how he thought Coulter would be able to establish that Dr. Fullum deviated from the standard of care (an explanation that the court rejected as "wrong" as a matter of law).

 Finally, the record makes clear that there would have been no "ambush" in permitting Dr. Pennanen to testify. From Dr. Pennanen's testimony during the deposition and from the explanations that Coulter's counsel gave at the deposition, Dr. Fullum's counsel had been specifically advised of how Coulter planned to prove her case.[42] The following excerpt from the transcript of Dr. Pennanen's deposition demonstrates that this is so:

Fullum's counsel: [Addressing Coulter's counsel] [A]re you planning to call this doctor as a standard of care witness at trial?

Coulter's counsel: Yes. And I plan to ask the doctor what is the standard of care, which is to say given an ordinary circumstance where a surgeon in Dr. Fullum's position and rendering the kind of care that was given to Ms. Coulter, what amount of time is the standard of care ordinarily between presentation of the patient and the surgery? That is to say that there are no complications and no extraneous problems which caused an unusual delay.

Fullum's counsel: Are you offering Dr. Pennanen to testify that Dr. Fullum violated the standard of care or are you simply calling her to express her opinion as to what the standard of care is?

Coulter's counsel: Well, certainly I am calling her to express her opinion as to what the standard of care is, which I understand to be two months, given no extraneous circumstances which would cause it to take longer. *And I think I can demonstrate that there were no such circumstances that would have caused them to take more than two months* and I think I can demonstrate through extrinsic evidence what it was that caused them to take five months [italics added].

At that point, Fullum's counsel said, "I guess I will be asking you some questions." Thus, although Dr. Fullum's counsel told Judge Combs Greene that Dr. Fullum would be "ambush[ed]" if Dr. Pennanen was permitted to testify regarding deviation from the standard of care, the foregoing excerpt shows that defense counsel had been advised of the testimony that was planned. We do not believe it is a fair result for Dr. Fullum to retain the benefit—Judge Combs Greene's reversal of her statement "Let's call [Dr. Pennanen] in," and the resultant directed verdict before the close of Coulter's case—that was based in large part on Dr. Fullum's counsel's cry of "ambush" and his failure to retract that claim even after Coulter's counsel had explained again how he would use Dr. Pennanen's standard-of-care testimony. Therefore, we will order that the trial court vacate the directed verdict as to Dr. Fullum and afford Coulter a new trial

41. We note that Coulter's "Statement of Genuine Issues of Material Fact That Preclude Partial Summary Judgment" did set out before the court several excerpts from Dr. Pennanen's testimony, and her full deposition had been filed with the court as an exhibit.

42. In addition, in the Joint Pre–Trial Statement, Coulter stated that Dr. Pennanen would "establish what the national standard of care was and thereby lay a foundation against which the care of the individual defendants will be shown to have been negligent."

on the medical malpractice allegations against him stated in her first Amended Complaint.[43]

## VI. Costs and Attorneys' Fees

After the entry of directed verdicts in their favor, Dr. Fullum, Dr. Taylor, and Gerald Family Care filed motions to recover their costs. Dr. Taylor and Gerald Family Care additionally sought attorneys' fees. Judge Combs Greene granted each of the motions (except that she declined to award Dr. Taylor and Gerald Family Care certain costs that she identified as "hotel" costs). Coulter seeks reversal of these awards. Because we are directing that the court vacate the judgment as to Dr. Fullum, the award of costs to him must also be vacated. We affirm the award of costs to Dr. Taylor and Gerald Family Care, but we reverse the court's ruling awarding attorneys' fees.

 Under Super. Ct. Civ. Rule 54(d)(1), "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the Court otherwise directs." The award of costs to the prevailing party "is within the trial court's discretion and may only be overturned upon our finding that the exercise of such discretion was an abuse." *Talley v. Varma,* 689 A.2d 547, 555 (D.C.1997). The award to Dr. Taylor and Gerald Family Care included the costs of depositions, witness fees, filing fees, copying, parking, transportation, medical/legal research, postage, long distance, hand deliveries/courier, and faxes. Many of these categories of costs are allowed as a matter of course. *See id.* ("court filing fees ... are allowed as a matter of course" and the "prevailing party may recover the cost of obtaining and copying records and other material necessary for case preparation and presentation"); *Harris v. Sears Roebuck & Co.,* 695 A.2d 108, 110 (D.C.1997) ("Deposition costs are ... taxable at the court's discretion ... [as long as] the deposition was necessary for case preparation"); *In re Corsetti,* 928 A.2d 691, 693 n. 6 (D.C.2007) ("A prevailing party may recover witness fees under D.C.Code § 15–714(b) (2001)"). Other categories generally are not allowed. For example, "medical/legal research" expenses generally are treated as attorneys' fees rather than as costs that may be awarded under Rule 54.[44] And, "[a]bsent unusual circumstances," parties generally must bear their own expenses of attorney travel and lodging. *See Robinson v. Howard Univ.,* 455 A.2d 1363, 1368 (D.C.1983). Reported cases present something of a mixed bag as to whether courts applying the federal counterpart of Rule 54 will allow the remaining categories of costs that the trial

43. We point out that nothing in this opinion would preclude the court from again entering a directed verdict in favor of Dr. Fullum if, at the close of Coulter's case, the testimony fails to establish prima facie that a delay that breached the standard of care also proximately caused the injury of which Coulter complains.

44. *See, e.g., Haroco, Inc. v. Am. Nat'l Bank & Trust Co.,* 38 F.3d 1429, 1440–41 (7th Cir. 1994) ("we see no difference between a situation where an attorney researches manually and bills only the time spent and a situation where the attorney does the research on a computer and bills for both the time and the computer fee. In both cases the total costs are attorney's fees and may not be recovered as 'costs' "); *Standley v. Chilhowee R–IV Sch. Dist.,* 5 F.3d 319, 325 (8th Cir.1993) ("computer-aided research, like any other form of legal research, is a component of attorneys' fees and cannot be independently taxed as an item of cost") (internal quotation marks and citation omitted). These federal cases are relevant because "Super. Ct. Civ. R. 54(d) is substantially identical to Fed.R.Civ.P. 54," and we therefore "consider federal decisional authority to be persuasive." *Ingber v. Ross,* 479 A.2d 1256, 1266 n. 13 (D.C.1984).

court's orders permitted appellees to recover here.[45]

■ Importantly, however, the rule in this jurisdiction is that "even as to special items of costs not representing customarily taxable court costs, the decision whether to allow or disallow the award is committed to the trial court's discretion." *Robinson, supra,* 455 A.2d at 1369. Coulter has not shown how any of the costs awarded to Dr. Taylor and Gerald Family Care were unnecessary or unreasonable, and thus has not borne the "great[ ]" burden she must bear to justify disturbing the trial court's award. *Id.* at 1370. Accordingly, we decline to hold that the trial court abused its discretion in awarding any of the categories of costs.

■ As to attorneys' fees, this jurisdiction follows "the American Rule under which . . . every party to a case shoulders its own attorneys' fees, and recovers from other litigants only in the presence of statutory authority, a contractual arrangement, or certain narrowly-defined common law exceptions. . . ." *Psaromatis v. English Holdings I, L.L.C.,* 944 A.2d 472, 490 (D.C.2008) (quoting *Oliver T. Carr Co. v. United Techs. Commc'ns Co.,* 604 A.2d 881, 883 (D.C.1992)). Consequently, "[c]laims for attorneys' fees and related nontaxable expenses shall be made by [a] motion" which "specif[ies] the judgment and the statute, rule, or other grounds entitling the moving party to the award. . . ." Super. Ct. Civ. Rule 54(d)(2). When determining an award of attorneys' fees, "[t]he Court shall find the facts and state its conclusions of law as provided in Rule 52(a)." Super. Ct. Civ. Rule 54(d)(2)(C). "The failure to articulate the reasons for a particular fee award renders the trial court's determination effectively unreviewable and has been held to constitute an abuse of discretion warranting reversal." *Frazier v. Franklin Inv. Co.,* 468 A.2d 1338, 1341 (D.C.1983).

■ Here, the trial court awarded Dr. Taylor and Gerald Family Care $48,416.00 in attorneys' fees without these appellees having offered any legal justification for a departure from the "American Rule." The court also failed to set forth any "findings of fact and conclusions of law" in support of the fee award, as Rule 54(d)(2)(C) and Rule 52(a) require.[46] We therefore must conclude that the court erred in awarding attorneys' fees. The entire award of attorneys' fees in favor of Dr. Taylor and Gerald Family Care must be vacated.

## VII. Conclusion

For the foregoing reasons, we affirm the judgment in favor of appellees Nixon Asomani, Eugene Taylor and Gerald Family Care, P.C. We affirm the order awarding costs to Eugene Taylor and Gerald Family Care, P.C. We reverse the ruling awarding attorney's fees to Eugene Taylor and to Gerald Family Care, P.C. We reverse the judgment and award of costs in favor of appellee Terrence Fullum, and as to appellee Fullum remand for a new trial. Upon remand, the trial court is instructed to revisit the so-called "gag order," so that, if the court determines that an order requiring confidentiality remains appropriate, it can tailor the order so that it infringes as

---

**45.** *Compare, e.g., Pinkham v. Camex, Inc.,* 84 F.3d 292, 294 (8th Cir.1996) ("costs for long distance and fax . . . and for messenger and express mail . . . are not ['costs'] under [Rule 54]") *with Tchemkou v. Mukasey,* 517 F.3d 506, 512 (7th Cir.2008) ("['costs'] include amounts spent on filing fees, postage, telephone calls and delivery charges").

**46.** The record reflects that the court treated the motion for attorneys' fees as unopposed. However, Coulter did file an opposition to the motion.

little as necessary on the parties' right to speak.

*So ordered.*