**William J. HARNETT and The Washington Capital Group, Inc., Appellants,**

v.

**WASHINGTON HARBOUR CONDOMINIUM UNIT OWNERS' ASSOCIATION, Appellee.**

Nos. 08–CV–1193, 09–CV–599.

District of Columbia Court of Appeals.

Argued March 9, 2010.

Decided July 19, 2012.

Vernon W. Johnson, III, Washington, for appellants.

Raymond B. Via, Jr., Washington, for appellee.

Before FISHER, Associate Judge, and SCHWELB and RUIZ,* Senior Judges.

RUIZ, Senior Judge:

Appellants, William J. Harnett and The Washington Capital Group, Inc., challenge the outcome of their protracted litigation with appellee, the Washington Harbour Condominium Unit Owners' Association. We affirm the trial court's judgment in favor of appellee.

## I. Facts and Procedural History

The Washington Harbour Condominium Complex ("WHC") is a residential/commercial development in Georgetown that includes 36 residential condominium units and 48 parking units. In accordance with the District of Columbia Condominium Act, D.C.Code § 42–1901, 1902, 1903 to – 1904 (2001), the unit owners own both the residential units and the parking units in fee simple absolute, and hold an undivided interest in the common elements of the condominium. The WHC is governed by appellee Washington Harbour Condominium Unit Owners' Association (the "Owners' Association"), which is in turn overseen by a Board of Directors.

Appellant, William J. Harnett, owns one WHC residential unit (PH–206) and two parking units (P–112 and P–116). Appellant, the Washington Capital Group, which is owned by Harnett, owns two WHC residential units (PH–207 and PH–208) and two parking units (P–123 and P–135). Appellants assert that the Owners' Association violated District laws, breached its fiduciary duty to appellants, and intentionally interfered with the use of their property by creating five new parking spaces in the WHC parking garage. Appellants also allege that the Owners' Association retaliated against Harnett by delaying authorization of necessary repairs on Harnett's residential unit because he publicly opposed the Owners' Association's decision to create the new parking spaces.

### A. The Parking Spaces

There are 48 parking spaces for more than 30 residential units, and many residents would like to be able to park two cars in the complex. When Harnett purchased his WHC residential unit, he purchased parking units P–112 and P–116 because of their large size, location near the elevator, and ease of access. Parking space P–112 had easy access by virtue of an open common area across the aisle from the parking space. Harnett frequently accessed his parking space by driving through this open common area and, to prevent others from blocking the area, he began to park his car there.

In early 2004, the Owners' Association created a Parking Committee tasked with analyzing and addressing the issue of inadequate parking for residents. The Parking Committee surveyed the owners to determine whether they would favor the creation of additional parking spaces. Subsequently, in August 2004, the Board of Directors decided to create five new parking spaces from areas previously designated as common elements in the parking garage and then auction those new spaces to residents with the highest bids. On August 18, 2004, the Board of Directors sent a memo to all unit owners, informing them of the decision to auction the parking spaces. The memo included a copy of the new parking layout as well as

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

procedures and date for bidding on the new spaces. New parking space P–2 was to be located in the common area across from Harnett's parking unit, P–112.

On September 9, 2004, WHC's residential director gave Harnett a "pre-auction information form" that requested residents to state whether they were interested in participating in a September 15, 2004 parking space auction. The form stated that residents "should complete the following information form and return it to the residential director no later than September 8th, 2004." Harnett refused to sign the form because it was "already past the due date." Other residential unit owners testified that there was a registration table and that bidders were permitted to sign up on the day of the auction, but Harnett did not register or bid on any of the parking spaces that day. He did, however, hire a court reporter to transcribe the auction proceedings.[1] At the auction, five new spaces were sold to the highest bidders. Each bidder entered into a "Parking Space Revocable License Agreement" with the Owners' Association. Harnett was not happy. Once a car was parked in the new parking space across from P–112, he asserted, he could no longer use P–112. According to Harnett, the drive aisle that abuts P–112, which is seventeen feet wide, did not give him sufficient room to maneuver his car into the parking space.

After the auction, the Owners' Association placed a sign on the wall that abuts Harnett's other parking unit, P–116, directing pedestrians to the residential elevator. Harnett complained that the Association did not ask for his permission to hang the sign, and that he would have denied permission because pedestrians passed through his space on the way to the elevators and he had been forced to repair

his car "at least once" because "a woman came through with her shopping cart and scratched the car."

## B. The Residential Repairs

According to the Owners' Association, the WHC has had a history of structural problems due to water infiltration. Indeed, the Owners' Association decided to hold a parking auction, in part, to raise money for needed structural repairs. In August 2004, shortly before the parking space auction, the Owners' Association informed WHC residents that it had recently lost an arbitration proceeding and would therefore need to authorize building repairs. The Owners' Association adopted a "triage" approach to repairing the condominium complex. The approach set forth two stages for repairs: first, safety hazards such as falling bricks would be addressed; second, the construction firm would focus on repairing active leaks. For efficiency, repairs would be made first to residential units at the top of the complex, so that water would not leak down into newly repaired units. Appellants contend that the Owners' Association engaged in undue delay in repairing their residential units and that this delay was in retaliation for having initiated court proceedings against the Association concerning the creation of new parking spaces.

## C. Procedural History

The trial court proceedings spanned nearly four years, and appellants now object to the trial court's handling of nearly every stage of the proceedings. On November 12, 2004, Harnett filed a complaint for declaratory judgment, naming as defendants the Owners' Association and several owners of specific parking spaces.

---

1. On the morning of the auction, Harnett parked his car in the common area across from his parking unit and his car was surrounded with "yellow caution tape."

On February 9, 2005, Harnett filed his First Amended and Verified Complaint for Legal and Equitable Relief (the "First Amended Complaint"), naming as defendants the Owners' Association, the Association's Board of Directors as a group, each member of the Board of Directors individually, and the resident of a condominium unit. The First Amended Complaint alleged: (1) the defendants violated the Condominium Act and the Condominium Instruments by creating a Parking Committee and auctioning new parking spaces ("Count I"); (2) the new parking spaces do not comply with the District's zoning laws and are dangerous and unsafe ("Count II"); (3) the defendants breached a fiduciary duty owed to Harnett by "creat[ing] and foster[ing] a scheme whereby New Parking Spaces were created and bid off" ("Count III"); (4) the defendants intentionally interfered with Harnett's use of his property, in particular his use of space P–112 and his use of the Common Elements, by approving the sale of the new parking spaces ("Count IV"); and (5) the defendants failed to make necessary repairs on Harnett's residential unit, rendering his home "uninhabitable," in retaliation for "initiating the present action" ("Count V"). The defendants filed a Rule 12(b)(6) motion to dismiss, and in January 2006 the motions court, Judge Dixon, dismissed Counts I and II of the First Amended Complaint as well as all claims against the individual defendants.

On February 16, 2007, The Washington Capital Group was added as a plaintiff. Four days later, Harnett and the Washington Capital Group filed a Second Amended and Verified Complaint. The Second Amended Complaint modified Count V (failure to make repairs) to include claims of retaliation regarding the Owners' Association's alleged failure to make repairs to the Washington Capital Group's residential units.

On November 26, 2007, after the close of discovery, the Owners' Association filed a motion for summary judgment, which the court denied. In the December 28, 2007 order the motions court, Judge Weisberg, noted that:

> Plaintiffs also argue that the board's failure to complete repairs to Plaintiffs' units constitutes a breach of its fiduciary duty by "fall[ing] short of the minimum standards of reasonableness." [citing Plaintiffs' Opposition to Defendants' Motion for Summary Judgment] This appears to be an improper attempt to import Count V, the retaliation claim, into Count III, the breach of fiduciary duty claim. The trial judge will have to decide whether the repair issue has been properly pled as a breach of fiduciary duty in Count III of the Second Amended Complaint.

On February 20, 2008, appellants filed a motion for leave to file a Third Amended Complaint, to "clarify" the scope of the claims with respect to Count III (breach of fiduciary duty) and Count IV (intentional interference with Harnett's property rights). On April 19, 2008, the trial court, Judge Bartnoff, denied appellants' motion. In June and July 2008, Judge Bartnoff held a bench trial and at the close of appellants' case, appellee filed a Rule 41(b) motion for dismissal which the court granted with respect to Count III (breach of fiduciary duty). On August 15, 2008, Judge Bartnoff ruled in favor of appellee with respect to the remaining counts, Count IV and Count V.

## II. Appellants' Objections to the Proceedings Below

Appellants appeal the (1) Rule 12(b)(6) dismissal of Counts I and II and appellants' claims against individual members of the Owners' Association; (2) denial of appellants' Rule 15(a) motion to file a Third

Amended Complaint; (3) grant of appellee's Rule 41(b) motion to dismiss Count III; (4) denial of various discovery requests made by appellants and the trial court's decision to allow appellee's introduction of certain late-produced documents; and (5) rulings against appellants on Counts IV and V. We conclude that none of appellants' claims warrants reversal and we affirm the judgment of the trial court.

## A. The Dismissal of Counts I and II and the Claims Against the Individual Defendants

 We review the trial judge's grant of a Rule 12(b)(6) motion to dismiss *de novo*, applying the same standard used by the trial judge. *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1196 (D.C.1997). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C.2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

### 1. Dismissal of Count I

Count I of Harnett's First Amended Complaint alleges that the Owners' Association exceeded its authority under the Condominium Act and the Condominium Instruments in creating a Parking Committee and later auctioning off the new parking spaces. Appellants focus on the legality of the Parking Space Revocable License Agreement, which states that the Owners' Association "grants a revocable license" to a unit owner for the use of a specific parking space. Appellants argue that the parking space Agreement is in effect a lease, not a license,[2] and that the Owners' Association

**2.** The Parking Space Revocable License Agreement states that the Owners' Association grants a "revocable license" to the residential unit owner for the use of a specific parking space. The Agreement expressly states that "[n]either this Agreement nor any rights granted herein shall be construed as a lease or other interest in real property, and shall not confer upon [the] Unit Owner any rights as a tenant." Each "revocable license" is assigned to a specific residential unit and the relevant parking space "shall only be used by the Unit Owner or the occupants of [the] unit; use by any other person will be deemed a breach of [the Agreement]." The unit owner is to pay a monthly fee of $190.56 for use of the parking space, and the Owners' Association Board of Directors has the right to increase the fee with notice. Upon the sale of a unit to which a specific parking space is assigned, the right to use the new parking space "shall automatically transfer to the new unit owner, who shall use the Space in accordance with the terms of [the] Agreement." The residential unit owner is also permitted to assign or transfer rights under the Agreement to other persons, but only pursuant to the procedures set forth in the Agreement, which re-

quire that the owner first provide the Owners' Association with the opportunity to purchase the parking space and terminate the Agreement. The Owners' Association has the right to terminate the Agreement if the unit owner fails to cure delinquencies in payment, violates the Agreement, applicable law, or the Condominium Instruments, or in the event of foreclosure of the residential unit.

In particular, appellants point out that the parking spaces (1) are assignable and transferable, *cf. Union Travel Assocs., Inc. v. Int'l Assocs., Inc.*, 401 A.2d 105, 107 (D.C.1979) (noting that a license does not run with the land and is "generally not assignable," whereas a lease "confers upon a tenant exclusive possession of the subject premises as against all the world, including the owner"); (2) are not revocable by the Owners' Association, *cf. Jackson v. Emmons*, 19 App.D.C. 250, 1902 WL 19620, at *4 (1902) ("[A] license is a personal privilege ... conveys no estate or interest, and is revocable at the pleasure of the party making it."); and (3) include a right of exclusive use. *See* 49 AM.JUR.2D *Landlord and Tenant* § 20 (2006) ("Exclusive possession of the leased premises is essential to the character of a lease."); 52 C.J.S. *Landlord &*

thereby exceeded its authority under the Condominium Instruments and the Condominium Act. Appellants' claim is premised on the WHC Bylaws, and depends on appellants' characterization of the parking space Agreements as leases, not licenses. Because the WHC Bylaws in Article III Section 20 state that the Board of Directors "may grant and accept easements and licenses," they argue, the parking space Agreement is beyond the Board's authority.

Even if it is arguable, however, that the parking space Agreement creates a lease, despite being titled a "license" in the Agreement itself,[3] the precise characterization of the parking space Agreement as granting a lease or license is not as significant as appellants argue. Therefore, appellants' claim is not legally well grounded.

The WHC Bylaws appoint the Board of Directors as "agent and attorney-in-fact for the Unit Owners of all of the Units and for each of them, to manage, control and deal with the interests of such Unit owners in the Common Elements of the Condominium to permit the Board of Directors to fulfill all of its power, rights, functions and duties." The legal question is what power the Owners' Association has. The Condominium Act provides that certain powers "shall" be accorded to the owners' association "[e]xcept to the extent *expressly prohibited* by the condominium instruments." *Id.* at § 42–1903.08(a) (emphasis added). Of specific relevance to appellants' claim, the Act provides that an own-

ers' association shall have the "power to grant an *easement, lease, license, or concession* through or over the common elements," and the "[p]ower to impose on and receive from individual unit owners any payment, fee, or charge for the use, rental, or operation of the common elements or for any service provided to unit owners." *Id.* at §§ 42–1903.08(a)(9)–(10) (emphasis added). The parties agree that the areas used to create the new parking spaces are common elements.[4]

■ Appellants' argument is that by referring only to "easements and licenses," the Bylaws exclude—by negative implication—the power of the Owners' Association to grant leases. Not so. Appellants' argument, based on the maxim "expressio unius est exclusio alterius"—that to express one thing implies the exclusion of others—might have some force if we were interpreting only the By-laws. Our interpretation, however, must take account of the Condominium Act, which contains the opposite presumption: that the authority specified in the statute is conferred unless it "expressly prohibited by the Condominium instruments." *Id.* The Bylaws do not mention, much less "expressly prohibit," the Board of Directors or the Owners' Association from exercising the broader power granted by the Act "to grant an easement, lease, license, or concession through or over the common elements." D.C.Code § 42–1903.08(a)(9). The negative implication appellants would have us draw to curtail the powers granted by the

---

*Tenant* § 337 (2003) ("The criterion for the distinction between a lease and a license is the right of possession of the land.").

**3.** *See Union Travel,* 401 A.2d at 105–07 (noting that the parties signed an agreement that was labeled a "License" agreement, but then concluding that the agreement was, in fact, a lease); 52 C.J.S. *Landlord & Tenant* § 338 (2003) ("The term applied by the parties does not necessarily determine whether a docu-

ment is a lease or license."); 49 Am.Jur.2d *Landlord and Tenant* § 20 (2006) ("The denomination of an instrument as a 'license' or a 'lease' by the parties cannot alter or affect its true nature. . . .").

**4.** The Condominium Act defines "common elements" as "all portions of the condominium other than the units." *Id.* at § 42–1901.02(1).

Act is too tenuous to satisfy the Act's requirement that any prohibition be "express"—that is, "in direct or unmistakable terms," "explicitly, definitely, directly." WEBSTER'S NEW INTERNATIONAL DICTIONARY 803 (3d ed.1971); *see* MERRIAM-WEBSTER (2012), *http://www.m-w.com* ("in an express manner: explicitly"). To accord such counter weight to Article III Section 20 of the Bylaws as appellant urges, also would go against another provision in the Bylaws, Article XI Section 2, which makes clear that they are "subordinate" to the Condominium Act.[5] Therefore, the Owners' Association possessed the powers prescribed in D.C.Code § 42–1903.08(a)(9)–(10), which includes authority to grant a lease.

Appellants' claim under the Condominium Act fares no better. Appellants argue that "the Parking Space Revocable License Agreement ... diminished the Common Elements for all Unit Owners, and therefore required the approval of 80% of the Unit Owners under the governing documents." Appellants rely on D.C.Code § 42–1903.20(a) and (b), which requires approval by 80% of the votes of the unit owners' association before "[a] portion of the common elements may be conveyed or subjected to a security interest." Whether characterized as a license or a lease, the parking space Agreement is neither a conveyance of nor a financial encumbrance on the common elements used for the parking spaces, as those terms are commonly understood. The Owners' Association's authority under the Act is to "grant" (not "convey") leases or licenses. It would make no sense to read one subsection of the Act as authorizing the Owners' Association to grant leases and licenses, only to have that authority curtailed by too-expansive a reading of the terms "conveyance" and "financial encumbrance."

In sum, because the Owners' Association is authorized, pursuant to the Condominium Act, to "grant a[ ] ... lease [or] license ... through or over the common elements" and "impose on and receive from individual unit owners any payment ... for the ... rental ... of the common elements," *see* D.C.Code §§ 42–1903.08(a)(9)–(10), and the WHC Bylaws do not "expressly prohibit[ ]" such actions and are "subject to" the Condominium Act, we conclude, as a matter of law, that the Owners' Association acted pursuant to its statutorily granted authority in entering into the Parking Space Revocable License Agreement. Because appellants did not state a valid legal claim, the trial court did not err in dismissing Count I.

*2. Dismissal of Count II*

Count II of Harnett's First Amended Complaint alleges that the new parking spaces are "clear violations of zoning laws, are dangerous or unsafe in some instances, and in other instances would make it impossible for existing parking space owners and Plaintiff to use their Parking Spaces or the Common Elements." Judge Dixon granted appellee's motion to dismiss Count II, reasoning that the WHC Bylaws provide that the Board of Directors is responsible for "defending [legal] proceedings ... instituted on behalf of, or against, the Association" and designate the Board "to act for the Association ... in governing the Condominium and in managing its affairs and business." The court concluded that Harnett had no "standing to privately enforce District of Columbia municipal parking code violations" and that the alleged zoning violations are "a legal matter between the Association and the D.C. government."

5. The Bylaws state that they "are subordinate and subject to the [Condominium] Act, the Declaration and the Condominium Plat and Condominium Plans."

 We need not decide the issue on which the trial judge ruled. At this juncture, even assuming that a challenge by appellants (rather than exclusively by the Owners' Association) was appropriate, litigation of Count II is barred by principles of res judicata and collateral estoppel. *Res judicata* "precludes relitigation in a subsequent proceeding of all issues arising out of the same cause of action between the same parties or their privies, whether or not the issues were raised in the first proceeding." *Carr v. Rose*, 701 A.2d 1065, 1070 (D.C.1997) (quoting *Molovinsky v. Monterey Coop.*, 689 A.2d 531, 533 (D.C. 1997)). Collateral estoppel applies "when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." *Ali Baba Co. v. WILCO, Inc.*, 482 A.2d 418, 421 (D.C.1984) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)). In such cases, "the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Id.* "An issue is actually litigated when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" *Id.* at 422 (quoting RESTATEMENT, *supra*, at § 27(d)). As we now explain, appellants have already litigated (and lost) the claim made in Count II.

 On January 12, 2007, approximately one year after the court dismissed Count II, Harnett initiated parallel proceedings before the District of Columbia Board of Zoning Adjustments ("BZA"), challenging the Zoning Administrator's decision to issue a building permit to the Owners' Association to create the new parking spaces. Specifically, Harnett claimed that the new parking spaces did not comply with the D.C. zoning regulation requirements for vertical clearance, size, striping, drive aisle width, and vehicle encroachment. The BZA affirmed the Administrator's decision after having considered and rejected Harnett's claims—nearly identical to those in Count II of his complaint—that "aspects of [the] new spaces do not comply with the Zoning Regulations and, that they negatively impact the use of the spaces he currently owns in the same garage." Harnett appealed the BZA's decision to this court, and we upheld the BZA's decision in a June 9, 2009 Memorandum Opinion and Judgment (Appeal No. 08–AA–564). The Owners' Association participated in the administrative proceeding before the BZA and was an intervenor when the matter was appealed to this court. As applied to the Owners' Association, therefore, Count II is barred by *res judicata.* To the extent that Count II is also directed to the Association's Board of Directors, individual members of the Board and another WHC unit resident, as the issues underlying the claim in Count II have been "actually litigated" by Harnett before the BZA, and judicially reviewed by this court on appeal, Harnett is collaterally estopped from relitigating the same issue under the guise of a civil lawsuit against appellee. *See Borger Mgmt., Inc. v. Sindram*, 886 A.2d 52, 62–63 (D.C.2005) (holding that issues that had been "actually litigated" before the DCRA could not be relitigated in Superior Court).[6]

---

**6.** In the opinion affirming the BZA's order rejecting Harnett's claims, we noted that Harnett's "complaints are not really with the Board of Zoning Appeals, but instead arise out of a contract dispute with the [Owners'] Association for diminishing what Appellant perceives as his rights under his contract of sale for the parking spaces." Memorandum Opinion and Judgment, No. 08–AA–564 (June 9, 2009), n. 1. The claim made in Count II filed in Superior Court, however, is not framed as a breach of contract action, but is based on alleged violations of the Zoning Regulations. It is therefore legally indistinguish-

### 3. Dismissal of Claims Against Individual Defendants

Appellants assert that the court erred in dismissing their complaint against the individual unit owners who had acquired a license in the new parking spaces because, "[i]n order to grant complete relief, particularly given the claims for injunctive relief, those individuals were necessary parties to the litigation." The motions court, Judge Dixon, reasoned that unit owners were not subject to suit because the Condominium Act and the WHC Bylaws clearly limit tort and contract liability to the Owners' Association.[7] We have no need to address the merits of either argument because it is moot, as we conclude in this appeal, appellants are not entitled to relief with respect to the creation and auction of the new parking spaces.

### B. Denial of Appellants' Request to File a Third Amended Complaint

On February 20, 2008—over three years after Harnett initiated this litigation in Superior Court—appellants filed a Rule 15(a) motion to file a Third Amended Complaint. Appellants' purpose in amending was to "clarify and confirm" that the breach of fiduciary duty alleged in Count III "includes the Association's failure to make repairs [on their residential units] ... [and] includes the Association's efforts, while this litigation was pending, to secretly recharacterize some of Plaintiffs' Parking Units as 'non-required' [pursuant to the District's zoning laws]." In addition, appellants sought to amend Count IV to "clarify and confirm that Defendant's secret actions to recharacterize certain Parking Units as 'non-required' is part of Plaintiffs' claim against Defendant for intentional interference with those real property rights and interests." Judge Bartnoff denied the motion to amend the Complaint a third time, reasoning that appellants should not be permitted to amend Count III because of the "late date and given that it's a BZA issue and that it doesn't affect [Harnett's] ownership interest." The court denied the request to amend Count IV because "at this point especially given that the complaint on this subject has been the same all the way through ... it would be prejudicial to the defendants and ... unreasonable to add a new theory of liability which involves a different standard, different proof, conceivably different experts and additional witnesses ... right before trial on an issue that's been around all this time."

 We review the trial court's denial of a motion to amend for abuse of

---

able from the administrative complaint Harnett pursued, and lost, before the BZA and on review by this court.

7. D.C.Code § 42–1903.09(a) provides: "An action for tort alleging a wrong done: (1) by any agent or employee of ... the unit owners' association; or (2) in connection with the condition of any portion of the condominium which ... the association has the responsibility to maintain, shall be brought against ... the association...." D.C.Code § 42–1903.09(c) provides: "An action arising from a contract made by or on behalf of the unit owners' association, its executive board, or the unit owners as a group, shall be brought against the association...."

Similarly, the WHC Bylaws state that "[t]he members of the Board of Directors *shall not be liable to the Unit Owners* for any mistake of judgment, negligence, or otherwise except for their own individual willful misconduct or bad faith." The Bylaws further state that, "[t]he Unit Owners shall indemnify and hold harmless each of the Directors from and against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Unit Owners unless any such contract shall have been made in bad faith or intentionally made contrary to the provisions of the Condominium Instruments."

discretion. *Coulter v. Gerald Family Care, P.C.,* 964 A.2d 170, 183 (D.C.2009). "The lateness of a motion for leave to amend ... may justify its denial if the moving party fails to state satisfactory reasons for the tardy filing and if the granting of the motion would require new or additional discovery." *Id.* (quoting *Pannell v. District of Columbia,* 829 A.2d 474, 477 (D.C.2003)). We have concluded that a trial court properly denied a party's motion to amend as tardy where the party " 'had all the necessary facts' to state the new claims it seeks to assert at the time it filed its previous complaint." *Flax v. Schertler,* 935 A.2d 1091, 1105 (D.C.2007) (quoting *Howard Univ. v. Good Food Servs., Inc.,* 608 A.2d 116, 120 (D.C.1992)). Other factors that we consider in analyzing the trial court's decision to grant or deny a Rule 15(a) motion include whether this was the party's first request to amend, the length of the proceeding, and the merits of the amended pleading. *Pannell,* 829 A.2d at 477.

■ Here, application of these factors leads us to conclude that the trial court did not abuse discretion in denying appellants' motion to amend the complaint a third time. Discovery was closed, and the litigation had already been under way for three years. Appellants had twice been granted leave to amend the complaint. With the exception of the claim that the Owners' Association had "secretly recharacterized" Harnett's parking space as "not required" in violation of zoning laws, the amendments related to information about repairs to appellants' units that had been available to appellants when the complaint was initially filed. Moreover, the proposed amendments did more than simply "clarify and confirm."[8] Thus, the trial court's denial of the motion to amend was not an abuse of discretion for the motion came at an unnecessarily late stage in the proceedings. To the extent that part of the proposed amendment was based on new information (regarding the alleged unlawful recharacterization of Harnett's parking space), subsequent to the conclusion of trial, the BZA rejected Harnett's claim in a parallel administrative proceeding, a decision we upheld on appeal to this

---

8. As originally pled, Count III, appellants' claim for breach of fiduciary duty, alleged that appellees "engaged in conduct designed to further and satisfy individual interests *with respect to acquiring and using additional parking spaces.*" (emphasis added). Thus, there was nothing to indicate that Count III also included claims for breach of fiduciary duty due to the Owners' Association's alleged failure to make repairs to appellants' residential units. As originally pled, Count IV, claiming intentional interference with property rights, similarly alleged that appellees violated appellants' legally protected interests *"by approving the sale of New Parking Spaces on Common Elements* ... including but not limited to his use of their Parking Units and their use of the Common Elements." (emphasis added). Thus, these allegations, like those in Count III, referred only to the creation of the new parking spaces, not the "secret recharacterization" of appellants' parking spaces that the amendment would have added. Finally, Count V, which is for failure to make repairs, alleged that the Owners' Association "knowingly and willfully breached *its obligation and agreements to make necessary repairs to Plaintiffs' Units* ... and, *in so doing* ... has taken retaliatory measures against Plaintiffs for initiating the present action *by making these Units ... uninhabitable and unusable.*" (emphasis added). The language of Count V makes clear that appellants alleged "retaliation" with respect to the alleged failures to make repairs on their residential units. In any event, the substance of appellants' claims was addressed by the court in connection with Count V. As we discuss *infra,* the record supports the trial court's findings that the repairs to the units were planned and carried out in a reasonable manner in light of the nature of the structural problems that needed to be addressed. Appellants do not explain how addition of a claim based on fiduciary duty could reasonably have altered the trial court's reasoning.

court. Thus, appellants were not prejudiced by the court's denial of the motion to amend because, as we have already explained, appellants are barred from relitigating that claim.

### C. Grant of Appellee's Rule 41(b) Motion to Dismiss Count III (Breach of Fiduciary Duty)

■■■■ At the close of appellants' case-in-chief, appellee moved for Rule 41(b) dismissal of Counts III, IV, and V.[9] Judge Bartnoff granted appellee's motion with respect to Count III, which alleged that the Owners' Association breached its fiduciary duty to appellants by "further[ing] and satisfy[ing] individual interests" with respect to the creation and import of the new parking spaces. Appellants assert that the court erred for two reasons: first, that by introducing several exhibits during cross-examination of appellants' witnesses, appellee had waived its right to move for judgment; and, second, that the trial court failed to resolve genuine issues of fact with respect to Count III. We uphold a trial court's grant of a Rule 41(b) motion so long as the court's factual findings and legal conclusions are not "clearly erroneous, with due regard being given to the opportunity of the trial court to judge the credibility of the witnesses." *Bay Gen. Indus., Inc. v. Johnson,* 418 A.2d 1050, 1054 (D.C.1980) (quoting *Marshall,* 391 A.2d at 1379–80).

■■■ As a threshold matter, we reject appellants' waiver argument. As we said in *O'Neil v. Bergan,* our "cases do not suggest ... that a defendant waives the right to move for a directed verdict at the close of the plaintiff's case merely by putting on evidence out of turn." 452 A.2d 337, 343 n. 7 (D.C.1982). Here, the trial court accommodated the defense witnesses' busy schedules by permitting introduction of their evidence out-of-turn. With respect to appellants' second contention—that the trial court failed to resolve genuine issues of fact—appellants argue that the trial court prematurely dismissed Count III because it did not "requir[e] [the Owners' Association] to explain or defend its actions." We disagree with appellants on this point as well.

■■■ To prevail on Count III's claim that appellee breached its fiduciary obligations, appellants needed to show that the Owners' Association's actions were not "reasonable." *See Bolandz v. 1230–1250 23rd St. Condo. Unit Owners Ass'n, Inc.,* 849 A.2d 1010, 1014–15 (D.C.2004) (holding that courts review the regulatory actions of condominium boards under a standard of reasonableness). We uphold the trial court's determination that appellants failed to prove that the Owners' Association breached its fiduciary obligations.[10] This conclusion is supported by the court's de-

---

9. Rule 41(b) provides: "For failure of the plaintiff to prosecute or to comply with these Rules or any order of Court, a defendant may move for dismissal of an action or of any claim against the defendant." In non-jury trials, a Rule 41(b) motion for dismissal is equivalent to a Rule 50(a) motion for judgment as a matter of law, except that, as the factfinder, the court is not bound to view the evidence in the light most favorable to the non-movant. *See Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1978) (noting that the court need not consider plaintiff's evidence as true, and if it finds that the evidence does not preponderate in plaintiff's fa-

vor, the court can enter judgment for the defendant). "If there is insufficient credible evidence to sustain each element of plaintiff's claim, or if, despite such credible evidence, a valid defense is evident from plaintiff's own case, judgment for the defendant is justifiable." *Id.*

10. Appellants presented the testimony of Lincoln Cummings, an expert on condominium association management. Cummings explained that industry best practices would dictate that a condominium address a parking situation "based first on the governing documents and secondly on thoughtful discussion

tailed factual findings about the manner in which the Owners' Association handled the creation and assignment of new parking spaces.[11] Appellants' "factual" references in their appellate briefs include several unsubstantiated allegations that do not include trial record citations. In light of the trial court's thorough factual findings, appellants' unsupported allegations to the contrary do not meet the formidable burden for justifying reversal of the trial court's findings as "clearly erroneous."[12]

## D. The Trial Court's Discovery Rulings and Admission of Late–Produced Documents

▪▪▪▪ Appellants challenge the trial court's denial of their motions to compel discovery, arguing generally that the trial court "failed to manage the discovery process properly." The "decision whether or not to grant a motion to compel discovery under Super. Ct. Civ. R. 37(a) is within the discretion of the trial court." *White v.*

and evaluation of the conditions ... taking into account the owner's awareness, understanding, acceptance." Cummings stated that communication is key to management of a condominium association and that the association's decision should be "fair, equitable, [and] consistent" to all the unit owners. The trial court's factual findings, which appellants do not dispute with any specificity on appeal, establish that the actions of the WHC Owners' Association satisfied the standards set forth by appellants' expert.

11. The trial judge found that: (1) Prior to this dispute, parking had been an issue in the building "for a very long time," in part because there were only 48 parking spaces for over 30 units. (2) The parking issue was raised to the board more than a year before the auction, and the board appointed a Parking Committee. The Committee conducted a survey, which showed that 8 out of 20 respondents (33 forms were distributed in total) desired additional parking and 15 out of 20 indicated that owners with one or no parking spaces should be given preference. The Parking Committee consulted with counsel. (3) The Board eventually determined that certain common areas should be designated as additional parking spaces after considering other options. (4) The final plan for the parking garage was released on August 18, 2004, and "people were told where the proposed spaces were" and "were given copies of the license agreements." (5) "[A]t the time the board decided to go forward and to create these spaces, they knew ... that Mr. Harnett had a problem. And they also investigated and it was their belief that while Mr. Harnett said that he wasn't able to use his space, the board believed that not to be the case." (6) Testimony from two other unit owners established

that they were able to park in Harnett's space and believed it could be used even after the creation of the new parking spaces. Therefore when the Board determined to create the new parking space, "they did that with the belief that they were not interfering with Mr. Harnett's use of his actual space." (7) The Board considered the issues raised by Harnett's petition at a meeting. The Board had surveyed the residents and knew that Harnett and others objected to the parking spaces, but they were not required to act on Harnett's petition. (8) The auction was eventually held, with some people registering on the morning of the auction, and there was no "irregularity" in the way that the auction was conducted that "would rise to a level of any kind of breach of fiduciary duty."

12. In particular, to the extent that appellants continue to argue that Harnett was "prevented" from registering and taking part in the parking space auction, we note that the trial court explicitly found otherwise. The court stated: "Mr. Harnett says that he was told that ... if he didn't fill [the form] out, he couldn't register. With all respect, I do not credit that testimony ... I do not believe that that is what was in fact said to him." Given Harnett's "considerable ability to read documents and insist on his rights," the court concluded that it was not "credible" for Harnett to say that he did not assert his rights at the auction, even though he was present that day, simply because the information sheet was labeled as a "registration form" and he believed he was too late to register. In contrast, the trial court credited the testimony of one of the other participants in the auction, who stated that there was a sign-in sheet at the auction and that residents were registering on the morning of the auction.

*Washington Metro. Area Transit Auth.,* 432 A.2d 726, 728–29 (D.C.1981). We reverse only if the appellant shows "that there has been an abuse of discretion which is prejudicial." *Id.* at 729 (quoting *Snyder v. Maryland Cas. Co.,* 187 A.2d 894, 895 (D.C.1963)); *see also Johnson v. United States,* 398 A.2d 354, 366 (D.C. 1979) ("Thus, at times we may find that the fact of error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required.").

█ Appellants assert that they suffered "real and substantial" prejudice as a result of the trial court's discovery rulings; however, the only specific examples they provide are that they "never obtained full information on relevant actions of the [Owners' Association], including the [Association's] discussions with the [District of Columbia Department of Consumer and Regulatory Affairs (DCRA)]," and that, during the deposition of one of the Owners' Association's representatives, they were not allowed to ask "questions relating solely or primarily to the Board of Zoning Adjustment appeal or to the legality or legitimacy of the creation of parking spaces and the auction of those spaces." As discussed above in connection with the court's dismissal of Count II, appellants have separately litigated—and lost—their claims grounded on the District's zoning laws. Accordingly, any information sought in discovery regarding appellee's negotiations with the DCRA and the zoning appeal is no longer relevant.

█ Appellants do not explain how denial of their motions to compel discovery with respect to the legality of the creation and auction of the parking spaces "jeopardized the fairness of the proceeding as a whole," and led the trial court to, in the words of *Johnson,* 398 A.2d at 366, "fail[ ] to undertake a required factual inquiry," "ignore[ ] an apparent deficiency in the record," or "fail to inquire [into] the record deeply enough." Appellants' similarly unsupported assertion that they "were denied the information to which they were entitled," without more specificity, does not satisfy their burden on appeal of showing an abuse of discretion, i.e., an error on the part of the court that caused them substantial harm.[13]

█ Appellants also assert that the trial court erred in admitting appellee's late-produced documents into evidence. First, appellant argues that the trial court erred in allowing the Owners' Association to introduce several repair invoices that were produced after the close of discovery, approximately one week before trial commenced. These invoices showed repairs being done on several WHC residential units, including Harnett's unit. As Judge Bartnoff explained, "the defendants have

---

13. In addition, appellants contend that the trial court improperly limited the deposition of Robert Pence, who testified as representative of the Owners' Association, to fourteen hours. We fail to see the unfairness or prejudice that appellants complain of. In a written order dated October 12, 2007, the court noted that nine hours should have provided ample time for appellants to depose Pence. However, rather than ending Pence's deposition altogether, the trial court allowed appellants another five hours of deposition time, in acknowledgment of the fact that Pence had also been designated as an individual witness, for a total of fourteen hours of deposition time. This outcome belies appellants' claim that the trial court mismanaged pre-trial discovery because of its "dim and unduly narrow view" of the merits of their claims. Indeed, in that same order the court ruled that Harnett was entitled to receive certain documents from the Board of Directors because of his status as a residential unit owner (since the documents were to be distributed to all owners as a matter of course), despite the fact that they were privileged and were almost certainly going to be used for the purposes of this litigation.

an ongoing obligation [for production] and it was my understanding from the documents I reviewed that there had been a substantial supplemental production that was made prior to the trial, in part in response to Judge Weisberg saying whatever you have got, you got to produce it." Judge Bartnoff concluded that the admission of the invoices would not prejudice appellants. On appeal, appellants have not explained how admission of the invoices caused prejudice to their "substantial rights," and we, like the trial court, discern no such prejudice. Second, appellants argue that the trial court erred in admitting a drawing of the parking garage prepared by appellee's parking expert that was first disclosed five days before appellee's parking expert testified. Appellants' own expert, however, testified that he had received and reviewed the map. On this record, appellants have not shown that they were unduly prejudiced by the admission of the parking garage map. We perceive no abuse of discretion in the trial court's decision to admit the repair invoices and map during trial.

### E. The Trial Court's Rulings Against Appellants on Counts IV and V

Appellants challenge the court's rulings, on the merits, against appellants on Counts IV and V. Count IV alleged that the Owners' Association intentionally interfered with Harnett's use of his property, including but not limited to, the use of his parking space and the common elements. Count V alleged that the Owners' Association breached its "obligation and agreements to make necessary repairs" on appellants' units, making them "uninhabitable and unusable," and retaliated against appellants for initiating the underlying action. We are bound to uphold the trial court's judgment "except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a).

### 1. *Count IV: Intentional Interference with Property Rights*

Harnett contends that he "plainly showed that the creation of the 'new' Parking Spaces and the [Owners' Association's] related actions interfered substantially with the use and enjoyment of Parking Units P–112 and P–116." He argues that the trial court "misapplied the relevant standards and inserted irrelevant considerations into its analysis" in deciding for appellee. Appellee responds that there is no cause of action for intentional interference with property rights in the District of Columbia and that, even if appellants are allowed to proceed with such a claim, the trial court's decision denying the claim is supported by the evidence.

Although a number of jurisdictions recognize an independent tort of intentional interference with property rights, *see* RESTATEMENT (SECOND) OF TORTS § 825 (1979) (including case citations from 1978 to 2011), we have not done so in the District of Columbia. In *Steinkamp v. Hodson*, 718 A.2d 107 (D.C.1998), we "assume[d], without deciding" that:

a cause of action *ex delicto* may be predicated upon an unlawful interference by one person with the enjoyment by another of his private property. A number of jurisdictions have adopted the rule of the Restatement that one is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land if (a) the other has property rights and privileges with respect to the use or enjoyment interfered with, (b) the invasion is substantial, (c) the defendant's conduct is a legal cause of the invasion, and (d) the invasion is either intentional and unrea-

sonable or unintentional and actionable under general negligence rules.

718 A.2d at 112 (quoting 74 Am.Jur.2d Torts § 34 (1974)). In *Steinkamp* we affirmed the trial court's rejection of the claim on the merits. *Id.*

As in *Steinkamp*, we see no need to decide the viability under D.C. law of a cause of action for intentional interference with property rights. Recognizing that we have not settled the question, the trial court assumed the viability of the intentional interference with property rights claim and, with reference to the elements set out in *Steinkamp* and after hearing the evidence, found that appellants had failed to prove those elements. The trial court found that appellants did not make out a prima facie case of tortious interference with their property rights "because even though [appellee's] actions were clearly intentional, [appellants] have not established that [appellee's] actions were unreasonable." Additionally, the trial court found, appellants did not prove that the conversion of the common area abutting Harnett's parking space into new parking spaces was a "substantial nontrespassory invasion" of appellant's interest in his private use and enjoyment of his parking space.[14] We are hard-pressed to say that the trial court, after considering the evidence presented, misapplied the law in rejecting appellant's claim. Therefore, as in *Steinkamp*, we "assume, without deciding," that appellant could avail himself of a cause of action for intentional interference with property rights, but uphold the trial court's well-founded determination that the elements of the action were not substantiated.[15] 718 A.2d at 112.

### 2. Count V: Failure to Make Repairs

■ Appellants have not provided legal authority for the proposition that a claim can be brought against a condominium association for retaliatory failure to make repairs. Nevertheless, appellants were allowed to proceed under the theory that appellee had an obligation to repair Harnett's unit and did not make the repairs in retaliation for appellants' filing of this lawsuit. At the end of trial, the court ruled as follows:

> [W]hatever the legal theory is for Mr. Harnett's claim that he's entitled to compensation as the result of how the building addressed the problems in his unit ... I find that ... he has not proven by a preponderance of the evidence that the building treated him in any way that would entitle him to that kind of compensation. There wasn't retaliation. There wasn't a failure to repair. The building is doing a compre-

---

14. The trial court commented that Mr. Harnett's argument "was that it was impossible to get in and out of the space. The record demonstrates quite conclusively that that is not so, that [it] is possible to get in and out of the space. And I find that in the context of this garage, it was [not] an unreasonable interference with Mr. Harnett's property rights in P–112 to create P–2 and P–3." The trial court noted that even if it was more difficult for Harnett to get into his parking space, "the issue is was that a substantial interference with Mr. Harnett's property rights. And on this record it seems to me the answer to that is clearly no." The court also found that "there's no evidence at all of any interfer-

ence" with his other parking space (P–116) due to a sign on the side of the wall that directs people to the elevators. The trial judge ruled that "the plaintiff has not satisfied his burden with regard to his claim of interference with property rights in connection with the creation of P–2 and P–3 either with regard to P–116, if that really is a serious claim, which I don't really think it is, or P–112."

15. Appellant has not suggested that the elements of the tort should be any different from what the trial court assumed, based on *Steinkamp*.

hensive renovation in his area of the building that goes beyond what they are doing for anybody else. And in those circumstances it seems to me that judgment properly should be entered for the defendants.

The trial court's ruling is supported by the evidence of record.[16]

For the foregoing reasons, the judgment of the Superior Court of the District of Columbia is hereby

*Affirmed.*

---

**16.** Appellants argue, with no legal authority cited in support, that the trial court erred in considering the fact that repairs had been performed on residential units other than Harnett's residential units as part of its analysis of the merits of appellants' retaliation claim. We think that appellants' argument is patently without merit in light of the two-stage "triage" approach to repairs that the Owners' Association adopted. Because it would not be possible to perform repairs on all units simultaneously, the question presented to the trial court was not whether there had been *any* delay in repairing Harnett's unit, but was instead whether such delays had been in accordance with the Owners' Association's plan for repairs. In these circumstances, the treatment of the other unit owners in the condominium was clearly relevant to the court's assessment of both the broad issue of whether the Owners' Association had breached its obligation to make repairs to Harnett's units and the narrower issue of whether this obligation had been breached in "retaliation" for Harnett's opposition to the parking space auction.